In re The **ESTATE OF Velma Lee ROBINSON, Deceased.**

No. 13–02–350–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 24, 2004.

14–95–01349–CR (Tex.App.-Houston [14th Dist.] Sept. 25, 1997, pet. ref'd) (not designated for publication), 1997 WL 590165, at *3.

Daniel McNeel Lane, Jr., Jo Beth Eubanks, Akin, Gump, Strauss, Hauer & Feld, Rex S. Heinke, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, for Appellant.

James J. Hartnett, Sr., James J. Hartnett Jr., R. Kevin Spencer, Will Ford Hartnett, Hartnett Law Firm, Dallas, Robert E. Bell, Larkin Thedford, Edna, for appellees.

Before Justices RODRIGUEZ, CASTILLO, and WITTIG.[1]

**OPINION**

Opinion by Justice RODRIGUEZ.

This is a will contest. Appellees, Velma Lee and John Harvey Robinson Charitable Foundation (Foundation), Fannie Merle Welch, Elaine Moore, Bobbie Byrom, Jerry Guffey, Mary H. Thedford[2] and, alternatively, Joe Webb and M.H. "Buddy" Brock, both as directors of the Foundation, contested the probate of a will executed by Robinson in 1995 (1995 Will) in favor of a will she executed in 1983 (1983 Will). Appellees alleged that Velma Lee Robinson lacked testamentary and mental capacity and was unduly influenced. A jury found that Robinson lacked testamentary capacity to execute the 1995 Will and lacked mental capacity to execute numerous estate-planning documents. It also found that Robinson had been unduly influenced. The jury returned a verdict in favor of appellees. Based on the jury's findings, the trial court entered a judgment vacating its order that admitted the 1995 Will to probate. The trial court also set aside related estate-planning documents.

By nine issues, appellants, Anna Marie Ayers and Derace Lee Ayers, Robinson's sister and nephew, respectively, who had been appointed co-independent executors of the Robinson estate and co-trustees of the Robinson living trust under the 1995 Will, complain of the following: (1) admission of expert witness testimony; (2) sufficiency of the evidence to support findings of lack of testamentary or mental capacity, undue influence, and agency; (3) joinder of the Foundation; (4) exclusion of evidence regarding the dissolution and revival of the Foundation; (5) charge error; and (6) failure to dismiss claims allegedly barred by limitations. We affirm.

**I. Factual Background**

Robinson's estate consisted primarily of her Jackson County ranch. Robinson had several foster children, but no biological children of her own.[3] Robinson was active in her church and gave generously during her life to numerous charities, including the San Marcos Baptist Academy (SMBA) and the South Texas Children's Home (STCH).

In 1980 Robinson executed a will (1980 Will) leaving most of her estate to the SMBA and the STCH. The 1980 Will also provided sizable bequests to family members and close friends. In June 1983, Robinson executed a handwritten will removing SMBA as a beneficiary. On October 28, 1983, Robinson executed the 1983 Will.[4]

1. Retired Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon Supp.2004).

2. Thedford's capacity in the will contest was as co-trustee of the Velma Lee Robinson Revocable Trusts, No. I and No. II and as a named co-independent executor of the estate of Velma Lee Robinson under her 1983 Will. Robinson named Victoria National Bank co-executor of the 1983 Will, but the Bank declined the appointment. Garland Sandhop,

Sr., also a named co-executor, was removed by the trial court onThedford's motion. Sandhop's removal is on appeal in cause number 13–02–00557–CV.

3. The Robinson's foster daughters include Thedford, Welch, Byrom, Moore, Guffey, Gail Janssen, and Betty Jean Wootan. Robinson's husband, Harvey, died in 1962. Robinson's sister, Anna, and several nieces and nephews survived her.

4. Robinson also executed a first codicil to the 1983 Will on August 24, 1990. These docu-

In that will she left the majority of her estate to the Foundation.[5] The 1983 Will also left large bequests to the Pooles and the Wootans, Robinson's good friends and long-time ranch managers; lifetime incomes to her sister Anna and her brother Cliff, who predeceased Robinson; and cash bequests to her nieces, nephews, and friends. However, the 1983 Will again excluded SMBA and, this time, removed STCH as a beneficiary. Robinson continued, however, to make gifts to SMBA and STCH as well as other charities, to her friends, and to members of her family. She also continued to fund the Foundation and direct to whom its annual gifts were to be given.

In 1994, however, Robinson stopped funding the Foundation. On February 25, 1995, Robinson signed a second codicil to her 1983 Will. This codicil reduced the gifts to her foster daughters and named Anna and Derace Ayers and Walton Donald Cavitt, another nephew, as independent co-executors. Her assets still went to the Foundation. Also in February 1995, Robinson signed a remove/replace resolution, apparently to remove the directors of the Foundation, including Thedford and B.J. Taylor, and replace them with Anna and Derace Ayers, and Cavitt.

On August 14, 1995, Robinson executed estate-planning documents wherein the estate would be divided upon her death among her relatives, primarily her nieces and nephews, not among her charities. These interests would pass through the 1995 Will, a pour-over will. Under this will, Robinson's sister, Anna Ayers, received the same bequest as under the 1983 Will. Anna and Derace Ayers were named as independent co-executors of the 1995 Will. During the summer of 1996, without being

informed she had been removed as a director, Thedford was asked to distribute all funds remaining in the Foundation.

In May 1996, nine months after she executed her 1995 Will, Robinson suffered a stroke. She suffered a second stroke in July 1996. On December 20, 1996, the dissolution resolution and articles of dissolution were filed, and a certificate of dissolution for the Foundation was obtained. Robinson had a third stroke in November 1997. She then left her ranch and moved into town. Robinson died on October 30, 1998 at the age of ninety-five.

II. Procedural Background

The 1995 Will was admitted to probate on December 8, 1998. On February 24, 2000, SMBA and STCH, beneficiaries named in a 1980 Will, sought to probate the 1980 Will and to set aside the order admitting the 1995 Will to probate. After learning that a later 1983 Will existed that left the bulk of Robinson's estate to the Foundation, Webb and Brock, as newly elected directors of the Foundation, sued Robinson's family and filed an application to probate the 1983 Will. In October 2000, a third amended petition was filed naming the Foundation as the lead plaintiff and withdrawing SMBA and STCH as contestants in the lawsuit. The Foundation was later joined by contestants Welch, Moore, Byrom, Jerry Guffy, and Thedford. The first trial ended in a mistrial when the jury was unable to reach a verdict.

On April 10, 2002, at the end of the second trial, the jury returned a verdict for appellees, finding Robinson lacked the testamentary capacity to execute the 1995 Will and the mental capacity to execute related estate documents. The jury also

ments will be collectively referred to as the 1983 Will.

**5.** The Foundation had been created in 1983 in an effort to minimize estate taxes and to ensure that Robinson's ranch would continue operating after her death.

found that Robinson had been unduly influenced. On May 13, 2002, the trial court rescinded and set aside its order admitting the 1995 Will to probate and denied probate of the 1995 Will and of a second codicil to the 1995 Will. The court removed Anna and Derace Ayers as independent co-executors and ordered all assets of the estate delivered to Thedford upon her qualification as independent executor of the estate. The court also declared numerous estate-planning documents invalid and set them aside.[6] By a separate order, the trial court ordered that the 1983 Will be admitted to probate as Robinson's valid last will and testament.[7]

## III. Testamentary and Mental Capacity

By their first three issues, appellants generally contend that appellees failed to carry their burden of proving Robinson lacked testamentary and mental capacity.

### A. Expert Testimony

In the first issue, appellants challenge the admission of expert testimony. They contend the trial court erred in failing to exclude the testimony of James B. Grigson, M.D., appellees' expert witness.

#### 1. Preservation

Before addressing appellants' substantive arguments on this issue, we must determine whether it has been preserved for our review. Appellees assert that appellants waived this challenge because their objections were not timely raised in the trial court. Objections to testimony, including the qualifications of experts and the reliability of their theories and methodology, must be raised at the trial court level, and failure to do so waives any error on those grounds. TEX.R.APP. P. 33.1(a); *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex.2002) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409–11 (Tex.1998)).

In the first trial of this case, appellants filed a motion to exclude the expert testimony of Dr. Grigson on the basis that his testimony was unreliable. On July 17, 2001 the trial court overruled that motion in open court stating "On the 'Robinson—in quotes—Motion.' It relates to Dr. Grig-

**6.** The court set aside the following documents: (1) the Action by Unanimous Consent of the Foundation; (2) The Velma Lee Robinson Living Trust dated August 14, 1995; (3) the Agreement of Limited Partnership of Robinson–Ayers, Ltd., dated August 14, 1995; (4) the Agreement of Limited Partnership of Robinson–Cavitt, Ltd., dated August 14, 1995; (5) the Agreement of Limited Partnership of V & H Robinson Ranches, Ltd., dated August 14, 1995; (6) warranty deeds executed by Robinson dated October 4, 1995; (7) Robinson's power of attorney dated December 16, 1995; (8) any transactions and/or transfers completed using the December 16, 1995 power of attorney; (9) the warranty deed dated August 2, 1997 executed by Anna and Derace Ayers pursuant to the invalid December 16, 1995 power of attorney; (10) mineral deeds executed by Robinson dated March 2, 1996; (11) the Action by Unanimous Consent of the Foundation dated November 15, 1996; and (12) the Articles of Dissolution of the Foundation.

The trial court also set aside all certificates for the limited partnerships because they were based on invalid agreements. It further set aside the Certificate of Dissolution of the Foundation issued by the Office of the Secretary of State of the State of Texas on December 20, 1996 because it was issued on invalid articles of dissolution. The judgment provided that the Secretary of State should revoke the certificates of limited partnerships. Finally, the court ordered that the Office of the Secretary of State of the State of Texas should immediately reinstate the Foundation as a valid Texas non-profit corporation in good standing. We further note that on June 14, 2002, the State reinstated the Foundation, and on June 20, 2002, the State certified that the Foundation's entity status in Texas was active.

**7.** The court ordered that the handwritten alterations to the 1983 Will and first codicil be disregarded.

son. I'm going to overrule the motion to exclude the expert testimony of Dr. Grigson." The first trial ended in a mistrial and, thus, returned the case to the posture it had been in before trial. *See Wiley v. Joiner*, 223 S.W.2d 539, 542–43 (Tex.Civ. App.-Fort Worth 1949, no writ) (mistrial is same as if no trial has taken place); *see also Cortimeglia v. Herron*, 281 S.W. 305, 306 (Tex.Civ.App.-Waco 1925, writ ref'd) (mistrial is termination of trial before judgment, not grant of new trial).

During the second trial, Dr. Grigson again was called to testify. Without objection, he testified as to his qualifications. Also without objection, Dr. Grigson presented a general medical discussion and a recital of Robinson's physical condition as revealed in her medical records. However, before Dr. Grigson offered his opinions regarding Robinson's testamentary capacity and mental capacity, appellants renewed their motion to exclude Dr. Grigson's testimony; testimony they claimed was unreliable. The trial court overruled the motion without specifying what analysis it applied in assessing the reliability of the testimony.

■ Appellants' objection to the reliability of Dr. Grigson's testimony, made in the form of their motion to exclude, was timely, its basis was clear, and a ruling was made by the trial court. *See* TEX.R.APP. P. § 33.1(a); *Guadalupe–Blanco River Auth.*, 77 S.W.3d at 807. Thus, appellant preserved this challenge for our review.

## 2. Admissibility of Dr. Grigson's Testimony

Having concluded that this issue has been preserved for our review, we now address appellants' contentions regarding the admission of Dr. Grigson's testimony. On appeal, appellants do not challenge Dr. Grigson's qualifications.[8] Instead, appellants contend that his testimony is scientifically unreliable because neither the *Robinson* factors, *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995), nor the *Gammill* analytical-gap test was satisfied. *See Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 726 (Tex.1998).

### a. Reliability

■ Rule 702 of the Texas Rules of Evidence permits a witness qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the fact finder in understanding the evidence or determining a fact issue. TEX.R. EVID. 702. A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *Id.*; *Robinson*, 923 S.W.2d at 556 (adopting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). When reliability of an expert's testimony is challenged, the trial court must "evaluate the methods, analysis, and principles relied upon in reaching the opinion ... [in order to] ensure that the opinion comports with applicable professional standards outside the courtroom." *Tamez v. Mack Trucks, Inc.*, 100 S.W.3d 549, 555 (Tex.App.-Corpus Christi 2003, no pet.) (quoting *Gammill*, 972 S.W.2d at 725–26). The proponent of the expert testimony bears the

---

8. We note that appellants did not challenge Dr. Grigson's qualifications in either their motion to exclude his testimony or during the course of the trial. Therefore, such arguments, if any, related to Dr. Grigson's qualifications have not been preserved for our review. *See generally Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409–11 (Tex.1998) (error waived if objection to testimony, including qualifications of experts, not raised at trial level).

burden of demonstrating that the expert's opinion is reliable. TEX.R. EVID. 104(a), 702; *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004); *Robinson,* 923 S.W.2d at 557.

In *Robinson,* the supreme court identified six nonexclusive factors to aid courts in determining whether scientific testimony is reliable.[9] *Robinson,* 923 S.W.2d at 557. However, these factors affecting reliability are not applicable to all expert testimony. *Gammill,* 972 S.W.2d at 726. For such instances, the supreme court adopted an "analytical-gap" analysis. *Id.* The trial court must determine whether there may be "simply too great an analytical gap between the data and the opinion proffered" for the opinion to be reliable. *Id.; see Tamez,* 100 S.W.3d at 555.

### b. Standard of Review

The admission or exclusion of evidence is within the trial court's sound discretion. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex. 1998). "On appeal, we review a trial court's evidentiary decisions by an abuse of discretion standard." *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28 (Tex.2000). When an expert's testimony lacks a reliable scientific basis, the trial court abuses its discretion by admitting it. *Ford Motor Co. v. Aguiniga,* 9 S.W.3d 252, 262 (Tex.App.-San Antonio 1999, pet. denied). However, a reviewing court cannot conclude that a trial court abused its discretion if, under the same circumstance, it would have ruled differently or if the trial court committed a mere error in judgment. *Robinson,* 923 S.W.2d at 558. Instead, the test is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary and unreasonable. *Id.*

### c. Analysis

Dr. Grigson's opinion that Robinson lacked testamentary and mental capacity on the day the contested will and other documents were signed was based on his review of Robinson's medical records. Appellants do not contend that this foundational data underlying Dr. Grigson's opinion testimony is unreliable.[10] Rather, they contend there is a gap between the evidence and Dr. Grigson's conclusion; that nothing more was offered to justify his methodology other than his "say so."

Dr. Grigson testified he had approximately twenty years experience as a forensic psychiatrist and handled approximately twenty-five civil cases a year, including a number of cases involving will and trust contests. He also testified that he worked on competency matters in criminal cases. Dr. Grigson explained that when he reviews medical records in a will contest he is looking "[f]or information ... to see how the person's functioning, what's happening to them, what type of illnesses they've had, how it affects them, primarily how they're functioning." Robinson's medical conditions identified by Dr. Grigson as significant to his opinion included high blood pressure in 1991; dizziness and weakness; a diagnosis of hypertensive cardiovascular

9. The six factors in *Robinson* are: (1) the extent to which the theory has been tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subject to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995).

10. Appellants do assert that the medical records contain no evidence that Robinson suffered any mental deficits or that her brain was oxygen-deprived.

disease; a balance problem in 1992; edema; shortness of breath in 1993; use of a wheelchair and oxygen; tiredness; nausea, vomiting, continued dizziness, feeling cold and clammy and a history of peripheral vascular disease in 1994; congestive heart failure; and a fairly low-grade heart murmur in 1990 that became much louder in 1994. Dr. Grigson also factored in a radiologist's report from a May 15, 1996 CT brain scan that was taken when Robinson suffered a stroke approximately nine months after signing the 1995 Will. The scan showed that Robinson had moderately severe atrophy which was worse over the frontal lobe and the temporal lobe of the cerebral cortex. It also revealed Robinson had suffered an earlier stroke in the basal ganglia and in the left occipital lobe. Although the earlier stroke was not recent, it could not be determined when it occurred. Additionally, Dr. Grigson considered a psychological assessment completed in May 1996. Of significance to him were the entries of a history of atherosclerotic heart disease,[11] high blood pressure, arthritis, and congestive heart failure. An entry indicating a history of frequent falling was also important because, as Dr. Grigson explained, when elderly individuals start getting hardening of the arteries they begin falling due to insufficient blood supply to the cerebellar part of the brain that coordinates all voluntary movements. The medical records further revealed that Robinson had two subsequent strokes and was diagnosed with atherosclerotic heart disease. In 1998, Robinson had a second brain scan that showed the atrophy had progressed to severe diffuse atrophy.

According to Dr. Grigson, Robinson's medical record entries showed there was a progression of a pathological disease process that was causing Robinson to lose brain cells. Dr. Grigson testified as to how the brain functions and the effect of strokes, high blood pressure, and atherosclerotic heart disease on the brain. The 1998 scan showed severe diffuse atrophy, thus establishing a growth pattern from at least moderate atrophy of the brain in 1996 to severe atrophy in 1998. Dr. Grigson testified that this impairment was brought about by the basic disease process and had taken a long time to develop. He also testified that the stroke was a result of hardening of the arteries, a disease process that had been going on for years. Dr. Grigson concluded Robinson had poor memory long before she had the stroke, again, due to hardening of the arteries.

Dr. Grigson acknowledged that Robinson could have been aware she owned land and had cattle, oil and gas leases, hunting leases, and rice fields on the land, and he assumed she could have recognized long-time family members. Nonetheless, based on his understanding of testamentary capacity and on Robinson's past and ongoing physical and mental conditions, in Dr. Grigson's opinion, Robinson did not have testamentary capacity when she signed the will on August 14, 1995. After setting out his understanding of the mental capacity required to sign a contract or

---

11. We find the following description of arteriosclerosis and atherosclerosis helpful. Both terms were used by witnesses to describe Robinson's medical condition.

> Arteriosclerosis means a hardening of the arteries, but if it does not affect a vital area, there is no heart disease; that is, if arteriosclerosis does not keep the heart from functioning normally, then arteriosclerotic heart disease is not present. Arteriosclerotic heart disease, used interchangeably with the term atherosclerotic heart disease, means that the heart is diseased by the hardening of the arteries, or arteriosclerosis; and this disease occurs when there is developed enough hardening of the arteries so that there is not a sufficient blood supply to the heart muscle.

*Community Life & Health Ins. Co. v. McCall*, 497 S.W.2d 358, 363 (Tex.Civ.App.-Amarillo 1973, writ ref'd n.r.e.).

deed, Dr. Grigson further testified Robinson did not have sufficient mental capacity to execute the trust and partnership agreements on that same date.

While Dr. Grigson's analysis of the medical records in this case involves the application of scientific principals, it is not pure science. This methodology is not easily tested by objective criteria, such as identifiable scientific formulas. *Cf. Tamez*, 100 S.W.3d at 555–56. Because Dr. Grigson's opinion is based largely on the application of his knowledge, training, and experience to the underlying data, the analytic gap analysis rather than the *Robinson* factors applies.

In this case, the trial court, using the analytical-gap analysis, could have concluded Dr. Grigson's medical experience and knowledge, coupled with his testimony about the methodology he employed in reviewing the medical records, demonstrate that the opinions he drew from the underlying medical records are reliable. *See Gammill*, 972 S.W.2d at 726. Thus, we conclude the trial court did not abuse its discretion by admitting Dr. Grigson's testimony. *See Allen*, 15 S.W.3d at 527–28.

#### d. Sitters' Notes

Appellants also contend the trial court erred in overruling their objections to Dr. Grigson's testimony regarding notes taken by Robinson's sitters. During redirect examination, Dr. Grigson confirmed that several entries from notes taken by Robinson's care givers supported his opinion. The trial court overruled appellants' objections to Dr. Grigson's testimony regarding the notes and to the admission of the excerpts of the notes to which he referred.

"A party is free to support his opinion testimony of an expert by proof of facts which tend to show its accuracy...." *Parkway Hosp., Inc. v. Lee*, 946 S.W.2d 580, 586 (Tex.App.-Houston [14th Dist.] 1997, writ den'd). On redirect, Dr. Grig-

son was asked to review specific entries from the sitters' notes to determine whether they comported with his expert opinion. Dr. Grigson testified he reviewed these excerpts for the first time during trial and that his opinion remained unchanged. He was not asked to give new opinions based on the sitters' notes. The notes did, however, confirm Dr. Grigson's assessment. *See id.*

Appellants assert, nonetheless, that the admission of this testimony was unexpected and deprived them of a fair opportunity to prepare a cross-examination of Dr. Grigson. However, appellants were aware of Dr. Grigson's opinion and that it was based on Robinson's medical records, not on the sitters' notes. It is undisputed that appellants produced the sitters' notes to appellees during discovery and that they knew the content of the notes. Furthermore, at his deposition, when asked whether the sitters' notes formed the basis of his opinion, Dr. Grigson replied they did not; that only the medical records provided the basis for his opinion. Dr. Grigson added, however, that "if those [sitters' notes were] supplied to [him] at a later period of time, they may reinforce [his] opinion or they may cause [him] to doubt [his] opinion." Thus, we cannot conclude Dr. Grigson's testimony regarding the sitters' notes was unexpected. Appellants had sufficient information about Dr. Grigson's opinion and the content of the sitters' notes to prepare a rebuttal with their own experts and to cross examine Dr. Grigson. The court did not abuse its discretion in admitting the complained-of evidence and exhibits. *See Allen*, 15 S.W.3d at 527–28. Accordingly, we overrule appellants' first issue.

### B. Sufficiency of the Evidence to Establish Capacity

Appellants contend by their second and third issues there is no evidence or insuffi-

cient evidence to support a finding that Robinson lacked testamentary and mental capacity when she executed the 1995 Will. Appellants assert that the documentary evidence and the testimony of Robinson's business associates, attorneys, personal physician, family members, and their expert overwhelmingly demonstrate that Robinson possessed both testamentary and mental capacity. Appellants also contend that even the testimony from the contestants' witnesses showed Robinson knew the extent and nature of her property and recognized all her family members.

### 1. Testamentary Capacity

In a will contest filed after a will has been admitted to probate, the burden of proof is on the party contesting the will to establish that the testator lacked testamentary capacity. *Lee v. Lee*, 424 S.W.2d 609, 610 n. 1 (Tex.1968); *In re Estate of Flores*, 76 S.W.3d 624, 630 (Tex. App.-Corpus Christi 2002, no pet.); Estate of *Graham*, 69 S.W.3d 598, 605 (Tex.App.-Corpus Christi 2001, no pet.). The Texas courts have defined testamentary capacity to mean sufficient mental ability, at the time the will is executed, to understand the business in which the testatrix is engaged (the making of the will); the effect of her act in making the will; and the general nature and extent of her property. *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.-Houston [14th Dist.] 2000, pet. denied); *see Flores*, 76 S.W.3d at 630; *Graham*, 69 S.W.3d at 605. The testatrix must also know her next of kin and the natural objects of her bounty, and have had sufficient memory to collect in her mind the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment about them. *Flores*, 76 S.W.3d at 630; *Bracewell*, 20 S.W.3d at 19; *see Graham*, 69 S.W.3d at 605.

The proper inquiry in a will contest on grounds of testamentary incapacity is whether the testatrix had testamentary capacity on the day the will was executed. *Graham*, 69 S.W.3d at 606 (citing *Lee*, 424 S.W.2d at 611). However, we "may also look to the [testatrix's] state of mind at other times if these times tend to show [her] state of mind on the day the will was executed." *Bracewell*, 20 S.W.3d at 20 (quoting *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex.App.-Fort Worth 1998, no pet.)). We may consider such evidence "if it demonstrates that a condition affecting the individual's testamentary capacity was persistent and likely present at the time the will was executed." *Id.* (quoting *Horton*, 965 S.W.2d at 86).

### 2. Mental Capacity

To establish "mental capacity" to contract in Texas the evidence must show that, at the time of contracting, the person "appreciated the effect of what [she] was doing and understood the nature and consequences of [her] acts and the business [she] was transacting." *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex.1969); *see Bach v. Hudson*, 596 S.W.2d 673, 675–76 (Tex.Civ.App.-Corpus Christi 1980, no writ); *Board of Regents of the Univ. of Tex. v. Yarbrough*, 470 S.W.2d 86, 90 (Tex.Civ.App.-Waco 1971, writ ref'd n.r.e.). Mental capacity, or lack thereof, may be shown by circumstantial evidence, including: (1) a person's outward conduct, "manifesting an inward and causing condition;" (2) any pre-existing external circumstances tending to produce a special mental condition; and (3) the prior or subsequent existence of a mental condition from which a person's mental capacity (or incapacity) at the time in question may be inferred. *See Bach*, 596 S.W.2d at 676. As a general rule, the question of whether a person, at the time of contracting, knows or understands the nature and conse-

quences of her actions is a question of fact for the jury. *See Fox v. Lewis,* 344 S.W.2d 731, 739 (Tex.Civ.App.-Austin 1961, writ ref'd n.r.e.).

### 3. Standards of Review

#### a. Legal Sufficiency

Reviewing a legal sufficiency challenge, we consider only the evidence and inferences that support the finding. *Lenz v. Lenz,* 79 S.W.3d 10, 19 (Tex.2002); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 276 (Tex.App.-Amarillo 1988, writ denied). We disregard all evidence and inferences to the contrary. *Lenz,* 79 S.W.3d at 19; *Maxus,* 766 S.W.2d at 276. Because appellants are attacking the legal sufficiency of an adverse finding of an issue on which they did not have the burden of proof, they must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.,* 64 S.W.3d 506, 518 (Tex. App–Corpus Christi 2001, pet. denied); *Rios v. Tex. Commerce Bancshares, Inc.,* 930 S.W.2d 809, 814–15 (Tex.App.-Corpus Christi 1996, writ denied); *Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 183 (Tex.App.-Fort Worth 1995, no writ).

The evidence is no more than a scintilla and, in legal effect, is no evidence "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence." *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex.1983). Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). We reverse and render judgment when we sustain a legal-sufficiency point. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 177 (Tex.1986) (per curiam); *Heritage Res., Inc. v. Hill,* 104 S.W.3d 612, 619 (Tex.App.-El Paso 2003, no pet.).

#### b. Factual Sufficiency

In reviewing a factual sufficiency issue, we examine and consider all of the evidence, not just the evidence that supports the verdict, to see whether it supports or undermines the finding. *Mar. Overseas Corp.,* 971 S.W.2d at 406–07. The party attacking a finding on which an adverse party bore the burden of proof must show that the record presents "insufficient evidence" to support the finding. *Gooch,* 902 S.W.2d at 184. We set aside the finding for factual insufficiency if the "evidence adduced to support the vital fact, even if it is the only evidence adduced on an issue, is factually too weak alone to support it." *See Ritchey v. Crawford,* 734 S.W.2d 85, 86–87 n. 1 (Tex.App.-Houston [1st Dist.] 1987, no writ) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 366 (1960)). "Of course, the jury, as trier of fact, is the sole judge of the witnesses' credibility and of the weight given to their testimony." *Bracewell,* 20 S.W.3d at 23. "Because an appellate court is not a fact finder, we may not substitute our judgment for that of the jury's, 'even if a different answer could be reached on the evidence.'" *Id.* (quoting *Knox v. Taylor,* 992 S.W.2d 40, 50 (Tex.App.-Houston [14th Dist.] 1999, no pet.)). "In that regard, the amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment." *Id.*

### 4. Analysis

In addition to the testimony offered by Dr. Grigson, Robinson's medical records were admitted as exhibits at trial. Additionally, lay witnesses testified to the change they saw in Robinson and in her ability to conduct business and understand

the estate plan. *Lee*, 424 S.W.2d at 611 (evidence on issue of testamentary capacity may come from testimony of lay witnesses).

Helen Sue Anderson worked as a care giver for Robinson from 1990 until 1998. She also supervised other sitters. Anderson testified Robinson was forgetful when Anderson first started working at the ranch and that Robinson's physical condition declined from that time. Anderson saw Robinson become more feeble and unable to care for herself. Robinson had trouble with her eyesight and hearing. She did not understand her doctor visits. In 1991 Robinson could no longer drive, and others took her to various activities. Although Anderson agreed that Robinson did follow her investments, worried about her taxes, and, on occasion, met with business persons, including her attorneys, she also testified Robinson was unable to handle her business and was becoming confused. Anderson also noticed that Robinson's memory was much worse after the flood in 1994.[12] She testified Robinson could not have understood the estate-planning documents and Robinson complained about this to her.

Ila May Emerson had been Robinson's friend since the 1950s. She worked for Robinson as one of her sitters from 1993 to July 1995. Emerson testified Robinson was forgetful. Her mental condition changed, especially after the 1994 flood. She was not as alert as she had been earlier. Robinson "got more hopeless" and could not remember things. Like Anderson, Emerson testified Robinson would have been unable to read the documents because of the size of the print and would not have understood the documents she signed in 1995. Emerson also testified, however, that Robinson played dominoes at her church after July 1995, and that she had discussions with Robinson about the Bible. Robinson was the "boss of her house."

Thedford testified Robinson occasionally did not recognize people at church and had trouble keeping up with her certificates of deposit as a result of bank mergers. However, Thedford also testified that up until the stroke in May 1996, Robinson was a strong woman within her family and knew what she owned and the character of what she owned. Her testimony additionally set out that Robinson's major reason for creating the Foundation was to keep the ranch a working ranch after her death.

The Reverend Joe Webb was Robinson's good friend and pastor for twenty-seven years before he retired and moved from the area in 1993.[13] Robinson and Reverend Webb discussed Robinson's intentions regarding her estate when he first began his work at the church in the mid-sixties. Reverend Webb discussed it again with Robinson in 1970 when he asked her if her will was up to date and if it was set up to achieve her desired purposes. Subsequently, the Foundation was created and her 1983 Will was executed.

After his retirement, Reverend Webb visited Robinson on three occasions. His first visit was in the Spring of 1993 after he returned from a trip to South Africa. During this visit, Robinson was not very responsive; there was no real discussion. Robinson asked no questions about the trip, although she had shown an interest in the trip earlier, specifically the mission work being done in East Africa. It ap-

---

12. On October 18, 1994, a record flood damaged Robinson's ranch house. Robinson stayed with Thedford for several days. After the waters receded, Robinson's family helped with the cleanup.

13. At the time of trial Reverend Webb was a director of the Foundation.

peared as if Robinson did not realize where the Webbs had been or what they had been doing. After fifteen minutes, Reverend Webb and his wife excused themselves, embarrassed by Robinson's non-responsiveness. This meeting confirmed a pattern of behavior Reverend Webb had observed since 1992. He was deeply concerned about Robinson's physical health as well as her emotional and mental health. Reverend Webb had the same experience during two later visits, the first in early 1995 after the flood and the second in mid–1995. These visits were also short, with little substantive discussion, just perfunctory responses by Robinson.

Throughout the years, Robinson indicated to Reverend Webb that her intent was to leave the bulk of her estate to charitable purposes and that she would take care of her family in other ways. Testimony regarding his visits in 1993 was evidence of her diminished functioning. Reverend Webb testified, based on his long relationship with Robinson, that she could not have understood the documents she signed in 1995 at issue in this contest and that leaving nothing to charity was absolutely inconsistent with how she had lived.

Jack Byrom, president of SMBA and husband of contestant Bobbie Byrom, saw Robinson within two weeks of her execution of the 1995 Will. He also testified that on that day "[Robinson] could not have read and understood and executed [the will and the partnership and trust] documents." After this early August 1995 visit, however, he received an unsolicited $5000 contribution from Robinson for SMBA and acknowledged it with a thank-you letter. Appellants assert that Byrom, by his acknowledgment, must not have believed he was responding to a person

incapable of understanding her actions. Moreover, Byrom admitted Robinson probably could have understood that in the 1995 Will she was giving 49% of the ranch to her brother's family, 49% to her sister's family, and a 2% tie-breaking interest to Derace Ayers.

Moreover, from observations found in the sitters' notes, the jury could have inferred Robinson lacked capacity when she signed the 1995 Will and other documents.[14] For example, early in 1993, entries in the notes included references to use of oxygen, dizziness, and not being "as out of it as she was yesterday." In mid–1993, sitters noted the following: "business matters have really begun to confuse her;" she got nervous and did not know what to do or how to do it; she could hardly stand, was dizzy, and complained she could not see; "M/R is nervous and upset over rain and M/Poole;" "[Robinson] is really nervous about all these changes in her life right now" including losing Mrs. Poole and Brother Webb and Nancy leaving; and "her mind is getting worse at times." Later in 1993, the sitters noted Robinson's mind was "getting really bad," "not good," and "bad tonight." On January 11, 1994 the sitter made the following entry: "she took her bath in the evening & she said she almost didn't make it back to the chair. She said that she thought the Lord was calling her home. Then she spent 1st part of night talking with the Lord." Other entries from January through April 1994 included "shortness of breath," "doesn't have any strength at all," "seems very out of it today," and "at 10 o'clock said that she sure was dizzy and that she didn't know why she was so dizzy this morning .... was still very dizzy."

14. We note that appellants produced sitters' notes from January 1993 through April 1997. These notes appear in the record. However, sitters' notes from May 1994 through 1995, if any, were not introduced at trial and, thus, are absent from the appellate record.

There was also testimony that Robinson had capacity at the time in question. Randy Stephenson, Robinson's oil and gas attorney, carried on business directly with Robinson from the 1970s through 1995. Robinson signed oil and gas leases and discussed them with Stephenson. She would ask questions if she did not understand the documents and they would discuss her concerns. In August 1994, when Robinson signed an option agreement, and in January 1995, when she signed an oil and gas lease, Stephenson testified he did not question her ability to execute the documents; "she was perfectly okay to sign."

John Lawrence Poole managed Robinson's ranch in the mid-nineties. Poole testified he met with Robinson every seven to ten days and talked with her on what was happening on the ranch. Poole testified it was not evident Robinson's mind was bad when he was around her. In 1995 when they discussed business, Robinson gave good responses and asked appropriate questions.

Don Sachtleben was Robinson's long-time financial planner from the early 1980s through her execution of the 1995 Will and estate documents.[15] Sachtleben met with Robinson at his office and at her ranch, even after the flood. He testified Robinson understood the business they transacted and took an interest in interest rates and tax-free bonds. "Mrs. Robinson knew what she was doing when she was doing business with me. I explained it to her, and she understood."

Ruby Van Sant, Anderson's sister-in-law, began working for Robinson as a sitter on August 1, 1995, the same month Robinson executed her will, living trust, and partnership agreements. Van Sant testified that before Robinson's stroke in May 1996, Robinson managed her business to some extent. She wrote checks, went through her mail with Van Sant, paid her bills, and decided whether she wanted to make a requested political contribution. Robinson also kept up with her holiday cards and always answered them or saw that it was done, sent thank-you notes for gifts received, enjoyed social visits, talked about the cattle business, enjoyed driving around the ranch and going into town, kept up with ranch happenings, was interested in the oil and gas business, had a good sense of humor, was exuberant for her age, and was "queen of her domain." Van Sant testified she could not recall any time before the May 1996 stroke when Robinson was not in command of her senses. Robinson was a strong, capable person with physical ailments. She remained alert until her death. At times, Robinson would be upset, but she never seemed confused or disoriented. Until her 1996 stroke, Van Sant testified, Robinson was probably capable of making decisions for herself but could have been influenced.

Reverend Jim Gilbert became Robinson's pastor at the end of 1993. He was amazed when Robinson, who was in her 90s, recited a very long poem from memory at a meeting in January 1994. He also testified, in his opinion, it was possible she could have understood the division of her property under the estate plan and that she was capable of understanding the significance of the gifts she had given to the church. Reverend Gilbert also testified that in the following months and years he could tell "there was a [physical] decline going on in her," and within two years of the meeting "it began to dawn on [him] that [Robinson] was not as present mentally as [she had been]."

---

**15.** Sachtleben's father-in-law farmed rice on the Robinson ranch. Sachtleben testified Robinson was like an aunt to his children after his wife died in 1988.

David W. Samuelson, M.D., Robinson's internist and personal physician, testified he adjusted her medications and began seeing Robinson regularly beginning in March 1993. Dr. Samuelson observed no indication that Robinson had a mental problem. She appeared alert and oriented. He did not observe that she was suffering from a gross impairment of her memory, reasoning, or judgment. Dr. Samuelson also testified that one could not determine whether Robinson had gross impairment from a CT scan. Dr. Samuelson testified that he treated Robinson when she had the stroke in 1996. Initially she was confused but went into rehabilitation for two or three weeks and appeared to be intact mentally. There was some initial change, but it was not permanent.

Appellants' expert, Richard Bernard Pesikoff, M.D., a psychiatrist and professor at Baylor College of Medicine, opined that Robinson's condition would in no way prevent her from understanding and meeting the requirements that are part of signing a will. He noted the medical records indicated a history of arteriosclerosis [16] and long-standing problems with hypertension which can also relate to insufficient oxygen, but they did not support a conclusion of gross impairment of Robinson's mental faculties. He testified that Robinson probably did have the capacity to write a will.

Furthermore, Dr. Pesikoff found no support in any documents he reviewed including, among other materials, sitters' notes and depositions, that Robinson lacked capacity. He pointed out how these documents showed Robinson was functioning at a normal level. According to Dr. Pesikoff, Robinson's medical records lacked any evidence that her condition was related to a heart condition or lack of oxygen to the brain. Rather, it was his opinion that

Robinson had lung problems, including asthma, some chest congestion, and trouble breathing. While Dr. Pesikoff agreed that lack of blood flow to the brain could create a problem, in his opinion it did not do so in this case. Before her stroke, according to Dr. Pesikoff, Robinson's blood was bringing sufficient oxygen to her brain. Dr. Pesikoff testified Robinson's medical records also lacked any evidence that her brain was oxygen-deprived. It was his opinion that Robinson's high blood pressure caused her dizziness, not a lack of oxygen to her brain. In his opinion, the high blood pressure also caused Robinson's confusion, tiredness, and ultimately a stroke.

Family members, including Robinson's sister and nieces and nephews, testified that Robinson was a strong, independent woman whose mind was sharp; that before the stroke she acted normal. She was interested in ranch business and activities. A nephew testified he noted nothing wrong with his aunt after the flood. Another nephew testified his aunt's mind was not as sharp, but it was good after the stroke. Witnesses testified that Robinson knew her family members and asked about those who were absent from a family gathering or a church function; talked appropriately about things, past and present; and understood the significance of documents she signed. Many testified that, for years, Robinson expressed her desire to leave the ranch to her family but felt she could not do so because of taxes. They also testified that Robinson expressed her desire that the ranch continue operating as a working ranch after her death.

There was also testimony and documentary evidence that Robinson worked with her attorneys from December 1994

---

**16.** Dr. Pesikoff was uncertain as to whether Robinson's medical records supported a diag-

nosis of atherosclerosis.

through May 1996 in formulating and implementing an estate plan. The evidence reveals that Robinson met with her attorneys either alone or with the Ayers. She discussed her concerns with them, particularly her desires to get her family more involved as executors and to leave the ranch to family but not to pay a lot of taxes. However, the record also reveals that there were communications between only Robinson's attorney and her relatives regarding her estate plan. The jury could have inferred that Robinson's counsel and relatives, by not including her in the conversations, did not believe that she understood the making of the will and the effect of her act, *Bracewell*, 20 S.W.3d at 19, or that she "appreciated the effect of what [she] was doing and understood the nature and consequences of [her] acts and the business [she] was transacting." *Mandell & Wright*, 441 S.W.2d at 845.

Finally, while the contestants relied on a number of excerpts of notes taken by Robinson's sitters in 1993 and 1994, appellants relied on other excerpts, including those setting out the following: Robinson was doing her "book work" followed by a full day of activities; she met with business associates and managed her finances; and she visited with friends, went to church, and donated money to favorite causes. Appellants contend the sitters' notes, taken as a whole, reveal a woman—elderly and with physical infirmities—living a full life.

■ Based on our review of the record, considering only the evidence and inferences that support the finding and disregarding all evidence and inferences to the contrary, we conclude that Dr. Grigson's testimony constitutes legally sufficient evidence of incapacity. *See Lenz*, 79 S.W.3d at 19; *Croucher*, 660 S.W.2d at 58; *Maxus*, 766 S.W.2d at 276. Dr. Grigson testified Robinson lacked testamentary capacity when she signed the 1995 Will and

mental capacity when she executed partnership agreements on August 14, 1995. Dr. Grigson provided testimony regarding physical problems, i.e., atherosclerotic heart disease or hardening of the arteries, that he concluded was consistent with mental incapacity. *See Croucher*, 660 S.W.2d at 57. Moreover, in addition to Dr. Grigson's testimony, there is evidence from which the jury could have inferred that Robinson's problems, shown to have existed as early as 1991, kept her from having testamentary capacity to execute a will in August 1995 and the mental capacity to sign related documents. Thus, we conclude there is some evidence to support the adverse finding of lack of testamentary and mental capacity. *See Croucher*, 660 S.W.2d at 58.

Furthermore, after reviewing all of the evidence, we conclude the evidence is factually sufficient to support the finding of incapacity. *See Mar. Overseas Corp.*, 971 S.W.2d at 406–07; *Gooch*, 902 S.W.2d at 184; *Ritchey*, 734 S.W.2d at 86–87 n. 1; *see also Bracewell*, 20 S.W.3d at 23 (because amount of evidence necessary to affirm judgment is far less than necessary to reverse judgment, and because we are not fact finder, we may not substitute our judgment for jury's, even if different answer could be reached on evidence).

Accordingly, appellants' second and third issues are overruled.

## IV. The Foundation

Appellants contend in their fourth issue that the trial court erred by allowing the Foundation to prosecute claims because it had been dissolved and did not have standing as a contestant. By their fifth issue, appellants also claim the trial court compounded this alleged error by excluding evidence regarding the revival of the Foundation.

The Foundation was dissolved on December 20, 1996. It joined the lawsuit as a plaintiff on October 26, 2000 challenging, in part, the validity of the documents Robinson signed to allegedly effectuate the Foundation's dissolution. Specifically, the Foundation alleged "Robinson did not have sufficient mental capacity under Texas law to execute the Dissolve Resolution on November 15, 1996, and, therefore, it is invalid...." The Foundation's claims, however, were brought within two years of the probate of the 1995 Will, see TEX. PROB.CODE ANN. § 93 (Vernon 2003) (statute of limitations for filing will contest is two years to contest the validity of will after admission to probate or after discovery of forgery or fraud), and within four years of the date the dissolution documents were filed and certificate of dissolution was issued. See TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 1997) ("every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues").

■■■ Appellants are not arguing a limitations bar as to the Foundation. Rather, they are contending the Foundation lacked standing because its claim was brought almost four years after the Foundation was dissolved. This argument is premised upon article 7.12 of the Texas Non–Profit Corporation Act, a survival statute which provides that claims by or against a charitable corporation must be brought within three years after its dissolution. TEX.REV. CIV. ANN. art. 1396–7.12 (Vernon 2003). To reach this argument, however, the Foundation must have been dissolved.

In this case, the court found Robinson lacked mental capacity to execute documents related to the dissolution of the Foundation. The trial court declared the articles invalid and ordered them set aside. The court further declared that the certifi-

cate of dissolution for the Foundation was invalid because it was based on invalid articles of dissolution. The court ordered the certificate of dissolution set aside. Finally, the court ordered the office of the secretary of state to reinstate the Foundation as a valid Texas non-profit corporation in good standing.

We have concluded that the evidence supports the finding that Robinson lacked mental capacity to sign the documents at issue in this contest. Thus, the judgment correctly declared that the articles were invalid and set them aside. Appellants' argument fails because the Foundation was never dissolved, and section 7.12 of the Texas Non–Profit Corporation Act does not apply. We overrule issues four and five.

## V. Undue Influence

By their sixth issue, appellants complain that the evidence is legally and factually insufficient to support the jury's findings of undue influence. By their seventh and eighth issues, appellants also complain of insufficient evidence and charge error regarding appellees' claim that the family's attorneys acted as agents for the family or acted on their behalf to influence Robinson. However, because undue influence assumes the existence of testamentary capacity, see Lowery v. Saunders, 666 S.W.2d 226, 233 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.), and because we have upheld the trial court's finding that Robinson did not have testamentary capacity, we need not address issues six, seven, and eight. See Tex.R.App. P. 47.1 (court of appeals to address every issue raised and necessary to final disposition of appeal).

## VI. Limitations as to Thedford, Byrom, and Guffey

By their tenth issue, appellants contend the trial court erred in failing to dismiss

the claims filed by Thedford, Byrom, and Guffey. Appellants assert that because Thedford, Byrom, and Guffey contested the lawsuit more than two years after the will was probated, their claims are barred.

 Section 93 of the Texas Probate Code provides that within two years after a will is admitted to probate any interested person may institute suit to contest its validity, except that any interested person may institute suit to cancel the will for forgery or other fraud within two years after the discovery of such forgery or fraud. *See* TEX. PROB.CODE ANN. § 93 (Vernon 2003). However,

> [i]t is firmly established in [Texas] that the timely institution of a suit to contest a will that [has] been admitted to probate, by a person who comes within the statutory definition of "interested persons," precludes the defense of limitations against other interested persons and contestants who would otherwise be barred.

*Turcotte v. Trevino*, 499 S.W.2d 705, 719 (Tex.Civ.App.-Corpus Christi 1973, writ ref'd n.r.e.); *see* TEX. PROB.CODE ANN. 3(r) (Vernon 2003) ("interested persons" mean "heirs, devisees, spouses, creditors, or any others having a property right in, or claim against, the estate being administered; and anyone interested in the welfare of a minor or incompetent ward"); *see also* TEX. PROB.CODE ANN. § 10 (Vernon 2003) (any person interested in an estate may, at any time before any issue in any proceeding is decided on by court, file opposition thereto in writing and is thereupon entitled to process for witnesses and evidence, and to be heard on such opposition, as in other suits).[17]

 The 1995 Will was probated on December 8, 1998. SMBA and STCH

timely filed the will contest on February 24, 2000.[18] The filing of the lawsuit tolled the running of the statute of limitations with respect to the rights of Thedford, Byrom, and Guffey to intervene as plaintiffs on January 5, 2001, more than two years after the contested will was probated, even though they would be barred by the two-year statute of limitation if they had instituted their suit in a separate action. *See id.* Appellants' tenth issue is overruled.

## VII. CONCLUSION

Accordingly, we affirm the judgment of the trial court.

---

17. Appellants do not argue that Thedford, Byrom, and Guffy are not interested parties.

18. We note that the Foundation joined the will contest in October 2000, and Robinson's foster daughters, Moore and Welch, joined on November 6, 2000.