**Opinion issued January 21, 2016**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-14-00705-CV

———————————

## IN THE GUARDIANSHIP OF PATRICIA FAY WESTBO, AN INCAPACITATED PERSON

---

**On Appeal from the Probate Court No. 1
Harris County, Texas
Trial Court Case No. 408,458-401**

---

## MEMORANDUM OPINION

Appellant, Mark Metzger, challenges the probate court's judgment, entered after a jury trial, in favor of appellee, Dayle D. Tucker, as Guardian of the Person and Estate of Patricia A. Westbo, in Metzger's lawsuit against Westbo to recover certain funds and an annuity account that he deposited in the Registry of the Harris

County District Clerk to supersede, pending appeal, a previously entered clarification order.[1]  In four issues, Metzger contends that the evidence is legally and factually insufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute a release dated May 22, 2006 (the "release"); Tucker is estopped from arguing that Westbo lacked the requisite mental capacity to execute the release; the probate court erred in instructing the jury to interpret the language of the release; and, alternatively, if the evidence is sufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute the release, he is entitled to a credit of $46,500.

We affirm.

## Background

In our previous opinions, we thoroughly discussed the factual background and complex procedural history of the litigation between the parties.[2]  In April 2002, Metzger sued Westbo for divorce, and the district court, in July 2002, entered its divorce decree.  In October 2002, Westbo filed a petition in the district court, seeking clarification of the decree in regard to the division of certain

---

[1]   *See Metzger v. Metzger*, No. 01-04-00893-CV, 2007 WL 1633445, at *1–7 (Tex. App.—Houston [1st Dist.] June 7, 2007, pet. denied) (mem. op.); Trial Court Cause No. 2002-21703.

[2]   *See Westbo v. Metzger*, No. 01-09-00952-CV, 2010 WL 2991121, at *1–6 (Tex. App.—Houston [1st Dist.] July 29, 2010, pet. denied) (mem. op.); *Metzger*, 2007 WL 1633445, at *1–3; *see also Westbo v. Metzger*, Nos. 09-08-200CV, 09-09-241CV, 2008 WL 4998349, at *1–2 (Tex. App.—Beaumont Nov. 26, 2008, pet. denied) (mem. op.).

property.  Then, Metzger and Westbo, on June 8, 2004, entered into a Mediated Settlement Agreement (the "MSA"), which required Metzger to pay Westbo $75,000, convey to Westbo an annuity account or accounts, and execute a promissory note in the amount of $45,000, secured by certain real estate in Tyler County.

Based upon the MSA, the district court, on June 18, 2004, entered an "Order on Motion for Clarification of Prior Decree of Divorce."  Subsequently, Metzger challenged the clarification order by appeal to this Court.[3]  Pending the appeal, Metzger superseded the clarification order by depositing in the Registry of the Harris County District Clerk the funds and the annuity account that are the subject of the instant lawsuit.  This Court, on June 7, 2007, modified the district court's clarification order to delete certain provisions, and we affirmed the clarification order as modified.[4]

In the meantime, Westbo, in or around March 2006, suffered a stroke.  Then, on May 22, 2006, Metzger sent a process server and a notary to Westbo's home to have her sign the release, by which, Metzger asserts, Westbo, in exchange for a

---

[3]     *See Metzger*, 2007 WL 1633445, at *1.

[4]     *Id*. at *7.  Prior to our rendition of judgment and the issuance of our opinion on June 7, 2007, Metzger filed another lawsuit against Westbo in the Tyler County District Court. *See Westbo*, 2008 WL 4998349, at *1.  Although the Tyler County District Court enjoined Westbo from attempting to collect the funds and annuity account held in the Registry of the Harris County District Clerk, the Beaumont Court of Appeals held that the Tyler County District Court lacked subject matter jurisdiction to so enjoin Westbo. *Id*. at *2–3.

3

$45,000 cashier's check from Metzger, relinquished any claim that she has to the funds and the annuity account held in the Registry of the Harris County District Clerk.

On December 12, 2007, Metzger filed in the district court the instant lawsuit, and he, in his amended petition, sought a declaration that the release signed by Westbo "is valid and existing" and she, thus, relinquished any claim to the funds and annuity account held in the Registry of the Harris County District Clerk. Metzger then filed a motion for partial summary judgment, asserting that the release is valid, he did not procure it by fraud, and it is supported by consideration. In response, Tucker asserted that Westbo did not "release her rights" to the funds and the annuity account, and moreover, she lacked the requisite mental capacity to execute the release. Tucker further asserted that "[t]he language of the release is completely botched," it did not release Metzger from his obligation to supersede the clarification order, and it, "[a]t its very best," is ambiguous, creating "a fact issue."

On June 18, 2009, the district court granted Metzger partial summary judgment, concluding that the release "is valid." Then, Metzger, on June 29, 2009, filed a motion for "[f]inal [s]ummary [j]udgment," asserting that Westbo, as a matter of law, "has no claim" to the funds and the annuity account held in the Registry of the Harris County District Clerk. He further requested that the district

4

court order the Harris County District Clerk to release the funds and annuity account to him. After the filing of several other motions and responses, the district court, on October 2, 2009, granted final summary judgment in favor of Metzger, and it ordered the Harris County District Clerk to immediately release to Metzger the funds and the annuity account.

Westbo appealed the district court's judgment, and this Court, on July 29, 2010, held that the district court had erred in granting Metzger summary judgment because the language of the release is ambiguous, creating a fact issue as to the proper construction of the terms of the release.[5] We noted that the release is in many respects, "incomprehensible" and "ambiguous."[6] Accordingly, we remanded the case to the district court.

The district court, due to the September 2011 appointment of Tucker as guardian of Westbo and her estate,[7] subsequently transferred the case to the probate court below for trial. After hearing the evidence, the jury found that Westbo did not have the requisite mental capacity at the time she executed the release. It also found that the release did not release Metzger from any and all claims of Westbo associated with certain causes of action. In accord with the jury's findings, the probate court then entered judgment that Westbo is entitled to

---

[5]     *Westbo*, 2010 WL 2991121, at *9.

[6]     *Id*.

[7]     Westbo currently lives in a nursing home in Montana.

the funds and the annuity account held in the Registry of the Harris County District Clerk.

## Sufficiency of Evidence

In his first issue, Metzger argues that the evidence is legally and factually insufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute the release because Westbo "did not present evidence of her mental capacity before the events relating to the signing" of the release "or after those events." Metzger asserts that the "only evidence that Westbo presented as to her supposed lack of mental capacity was the testimony of Dr. Samuel Neely," which was based on "pure speculation, without any scientific foundation."

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Associated Indem. Corp. v. CAT Contracting, Inc*., 964 S.W.2d 276, 285–86 (Tex. 1998); *Ned v. E.J. Turner and Co*., 11 S.W.3d 407, 408 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it."  *Id.* at 822.  The term "inference" means,

> [i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true.  A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (internal quotations omitted).  "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts."  *Id*.

If there is more than a scintilla of evidence to support the finding, we must uphold it.  *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).  "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted).  However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822.  "A reviewing court cannot

substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

In conducting a factual-sufficiency review, we must examine, consider, and weigh all of the evidence that supports or contradicts the jury's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

In question one of its charge to the jury, the probate court asked, "Do you find from a preponderance of the evidence that Patricia Westbo had the requisite mental capacity (as defined below) at the time she executed the document entitled 'Full Release' dated May 22, 2006?" The probate court defined mental capacity as "sufficient mind and memory to understand the nature and consequences of her acts and the business she was transacting." And the jury answered, "[N]o."

8

The law generally presumes that a person possesses the requisite mental capacity at the time of executing a conveyance deed; thus, a party contesting such capacity must shoulder the burden of proof. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.). Evidence concerning capacity either prior or subsequent to the time of the conveyance may be relevant to the capacity issue. *Id.*; *see also Haile v. Holtzclaw*, 414 S.W.2d 916, 926 (Tex. 1967); *Cole v. Waite*, 246 S.W.2d 849, 852 (Tex. 1952). Circumstantial evidence may be relevant to proving capacity or the lack thereof, including: (1) the conduct of the party in question; (2) circumstances tending to produce a particular mental condition; and (3) prior or subsequent existence of a mental condition from which a party's capacity or incapacity at the time in question may be inferred. *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi 2004, pet. denied). The question of capacity is generally one for the jury. *See id.* at 793–94.

In support of her assertion that Westbo lacked the requisite mental capacity to execute the release, Tucker, who is Westbo's daughter, presented to the jury her own testimony and the deposition testimony of Dr. Samuel Neely.

Dr. Neely testified that on March 23, 2006, he saw Westbo, who was complaining of "numbness" on her left side. He then admitted her to a hospital on March 31, 2006 because of "acute left-sided weakness from a stroke in the right brain." Neely noted that the right side of the brain "controls the left side of the

9

body, so [the stroke] paralyzed the left side of her body," and Westbo probably had "a blood clot that plugged up a blood vessel in her right brain." After her discharge from the hospital on April 3, 2006, Westbo spent time at a rehabilitation facility "to maximize the recovery after the stroke." Neely explained that some people "get nearly complete recovery after a stroke," "some people get no recovery," "there [are] lots of people in between," and "rehabilitation is designed to maximize the recovery."

When Dr. Neely saw Westbo on May 8, 2006,

she was in a wheelchair because she was so weak on the left side, she couldn't ambulate well; and she had a few other problems [he was] attending to. She had kind of dislocated a bone in her left hand . . . and [h]e also set her up for evaluation of dizziness with an inner ear doctor.

And when Neely saw Westbo on August 7, 2006, he noted that she still had

significant left-sided weakness. She could move her left hand but couldn't grip . . . a glass effectively to hold it. She could bear weight on the left leg. Even though she was in a wheelchair, if she stood up, with assistance she could bear some weight. And [h]e had additionally at a certain point had her see a hematologist who had found some clotting abnormalities that might have been a contributing factor to her stroke, who was helping [Neely] with her blood thinning therapy to lower her risk for another stroke.

In diagnosing Westbo, Dr. Neely opined that she had "an embolic stroke in the right brain that caused her left-side weakness, maybe partly aggravated by the[] clotting abnormalities that the hematologist detailed, Dr. Guzley, and then left her with a significant left-sided weakness and *additionally impairment of her thinking*

10

*and memory.*"  (Emphasis added.)  In regard to Westbo's cognitive mental capacity following her stroke, Neely opined:  "[It] would have been impaired.  I don't think we had formal neuropsychological testing to detail all the cognitive impact, but it's usual [for a person] after a stroke in this capacity to [have] impair[ed] thinking and memory."  He further opined, based on his "medical knowledge" and "examination of the patient," that Westbo did not have sufficient mental capacity to understand the release that she signed on May 22, 2006.

Dr. Neely further explained that "[a]t the present time, [Westbo's] neurologic deficits are probably fixed, especially as it relates to the stroke that had occurred in March of 2006."  He prescribed for Westbo "Aggrenox," a blood thinner which prevents blood clotting, to lower her risk of having another stroke.  And Neely saw Westbo again on October 4, 2007 because she had "a history of a seizure" that occurred after her visit on August 7, 2006.

Tucker opined that Westbo did not know what she was doing when she signed the release on May 22, 2006.  Tucker testified that Westbo's condition did not improve from the time that she had the stroke in March 2006 to the time that Tucker moved Westbo to the state of Washington in 2009.[8]  Tucker explained,

> It's hard to quantify but my mother -- before the stroke, my mother
> was very sharp, very intelligent.  When I moved her, actually I noticed
> this on my visit in 2007, she would repeat things that she had already
> said.  She would forget from one minute to the next what you had

---
[8]     As noted previously, Westbo now resides in a nursing home in Montana.

said.  She used to joke that if you did something or said something to her before she had a nap, she wouldn't remember it when she woke up.

Tucker specifically noted that Westbo, since her stroke, had been slurring her words and,

> [w]hen she sent me cards and little notes, because she used to do that a lot, her handwriting had changed, she quit crossing her t's and dotting her i's and things like that[.] . . . She has good days and she has bad days.  There are days when I would call and the people who were staying with her . . . would answer the phone and they would give the phone to her and she wouldn't talk to me.  And then there were days when she would talk to me [and] she would talk about stuff that wasn't relevant that had happened years before.

In other words, Westbo experienced waxing and waning of lucidity.  And after the stroke, Westbo's signature changed and certain real estate documents signed by Westbo did not contain her normal signature.

When asked how Westbo could transfer 120 acres of real property to Tucker on October 27, 2009 if she did not know what she was doing when she signed the release on May 22, 2006, Tucker responded that Westbo had, in 2003, expressed her intention to transfer the land.  Tucker opined that Westbo knew what she was doing when she transferred the land to Tucker and when she sold other real estate. And Tucker subsequently transferred to her brother the 120 acres of real property that Westbo had transferred to her because Westbo had previously expressed her desire for the land to stay in the family and Tucker could not afford it.  Moreover, Tucker sold Westbo's house because it was due to be foreclosed on.  Regarding

these real estate transactions, Tucker explained, "Technically speaking, based on the signatures on those documents, [Westbo] sold those properties. The truth of the matter is, I handled the transactions. . . . I was the one that spoke with the realtor that sold her house. I handled all of those conversations. All my mother did was sign the papers because I asked her to."

In support of his assertion that Westbo had the requisite mental capacity to execute the release, Metzger presented to the jury the testimony of Herschel Day, a process server, and Susan Rosen, a process server and notary.

Day testified that on May 19, 2006, he, accompanied by Rosen, delivered to Westbo the release, a check, and a warranty deed. However, Westbo refused to sign the papers, stating that "you will need to take it all back to [Metzger], he is not going to get any signatures until my lawyers approve this." Day left with Westbo a copy of the release for her to review.

On May 22, 2006, Day, again accompanied by Rosen, returned to Westbo's home, where they found her "seated in the middle of the floor and she was very cheerful, just sitting there watching TV." Westbo recognized Day and called him by his nickname, "Butch"; she knew him by name because he had served her with papers on previous occasions. He and Rosen were with Westbo for approximately 30 minutes while she read the papers, including the release. And Westbo did not do or say anything to indicate that she did not understand why Day and Rosen were

13

at her home. At some point, Westbo asked Day whether he had another check for $600 because "[m]y attorney told me there was supposed to be a check for six hundred dollars." Because he could not contact Metzger, Day wrote Westbo a $600 check from his own account. He noted that Westbo did not seem to have any trouble signing the warranty deed, the release, a motion for nonsuit, an order for nonsuit,[9] or Rosen's "notary book." And he opined that Westbo appeared to have a rational understanding of what he was doing and what she was doing.

On cross-examination, Day admitted that when Westbo signed her name, it was the first time that he had seen her sign anything. And when Westbo's counsel showed Day her signature, Day noticed that she had not crossed the letter "t" nor dotted the letter "i" in several documents, including the release.

Rosen testified that she accompanied Day to meet with Westbo on May 19 and May 22, 2006. She noted that Westbo, on May 19, did not have any trouble speaking, and she appeared to understand the matters discussed. And Westbo did not indicate that she was confused or did not know what she was doing. However, in contrast to Day, Rosen did not believe that Day left the release with Westbo on May 19. During the May 22 visit, Westbo had no trouble communicating, and she again appeared to have a rational understanding of what she was doing. Westbo even communicated to Rosen that she had three different addresses for notary

---

[9] Metzger subsequently filed the nonsuit to dispose of his lawsuit against Westbo in Tyler County.

14

purposes. And when Day gave the documents to Westbo, she "looked at them and no questions were asked."

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have reasonably found that Westbo lacked the requisite mental capacity to execute the release on May 22, 2006. Dr. Neely saw Westbo after she had suffered a stroke just two months before she signed the release, and he diagnosed her as suffering from stoke symptoms, including impaired thinking and memory. Neely opined that Westbo would not have been able to understand the complex legal documents that she signed on May 22, 2006. And he based his opinion on his medical knowledge and his examinations of her, having met with her on March 23, May 8, and August 7, 2006 and October 4, 2007. Moreover, Tucker testified that after her stroke, Westbo showed signs of memory lapse and a waxing and waning of lucidity. Thus, Tucker opined that Westbo could not have known what she was doing when she signed the release. This evidence demonstrates that Westbo did lack the requisite mental capacity at the time she signed the release. *See Decker*, 192 S.W.3d at 652; *In re Estate of Robinson*, 140 S.W.3d at 793. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute the release on May 22, 2006.

Viewing the evidence neutrally, both that which supports and contradicts the jury's finding that Westbo lacked the requisite mental capacity to execute the release, we also conclude that it is not so weak, nor is the finding so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Pool*, 715 S.W.2d at 635. Both Day and Rosen did testify that when they met with Westbo on May 19 and May 22, 2006, she appeared to know what she was doing. However, whether there was contradictory evidence or not, the jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was free to discount, or disregard altogether, the testimony of Day and Rosen. *See Golden Eagle Archery*, 116 S.W.3d at 761.

Metzger further notes that after her stroke,

Westbo executed several legal documents disposing of all her real property in Texas. These conveyances and the dates thereof were: a Modification and Extension Agreement to the lienholder on her home, dated December 12, 2006; a General Warranty Deed to the Cannons [the person purchasing her home in Lockhart, Texas], dated April 1, 2009; a Warranty Deed with Vendor's Lien to Tomahawk Ranch, dated May 12, 2009, conveying over 120 acres of valuable land in Texas; and a Deed to her daughter, D. Tucker, dated October 27, 2009.

(Internal footnotes omitted.) He asserts that "[t]hese additional actions by Westbo refute Dr. Neely's belief that her 'deficits' were continuing and show that she had mental capacity when she executed the Full Release and Special Warrant[y] Deed on May 22, 2006." However, the record also shows that Tucker had Westbo's

16

power of attorney after her stroke, allowing Tucker to execute various real estate transactions for her mother.  Tucker also explained why and how the real estate transactions were executed, she was the one who handled the sales, and that Westbo simply signed the pertinent documents at Tucker's direction.  Again, the jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was free to accept Tucker's explanation about the real estate transactions.  *See id.*

Accordingly, we hold that the evidence is factually sufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute the release on May 22, 2006.

Metzger further challenges the scientific reliability of Dr. Neely's expert testimony, asserting that it "was pure speculation, without any scientific foundation."  He asserts that "[a]lthough Dr. Neely may be an accomplished physician with extensive training and expertise, the controlling issue is not the adequacy of his qualifications but whether his opinion testimony was scientifically reliable."  Metzger complains that Neely did not see Westbo on either May 19 or May 22, 2006, did no "formal neuropsychological testing" on her, and did not discuss the "severity of the supposed stroke."

A party must present a complaint regarding the reliability of expert testimony to the trial court, or appellate review is waived.  *See Maritime Overseas*

*Corp. v. Ellis*, 971 S.W.2d 402, 409–10 (Tex. 1998); *see also* TEX. R. APP. P. 33.1(a)(1).  No objection is required, however, to preserve a no-evidence challenge to conclusory expert testimony.  *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232–33 (Tex. 2004) (objection required when challenging "underlying methodology, technique, or foundational data" supporting expert testimony, unless testimony wholly speculative or conclusive).  Here, Dr. Neely based his opinion regarding Westbo's requisite mental capacity on his examinations of her both before and after she signed the release on May 22, 2006.  Thus, his testimony, based on his observations and medical expertise, is not wholly speculative or conclusory.  And Metzger did not assert his scientific reliability challenge to the trial court.   Because Metzger did not assert this complaint at trial, he did not preserve it for appellate review.  *See* TEX. R. APP. P. 33.1(a)(1); *Ellis*, 971 S.W.2d at 409–10.

Metzger next complains that Tucker did not present the testimony of another person, presumably a caretaker, regarding Westbo's mental capacity.  And he argues that because Westbo talked to her lawyer prior to signing the release, her lawyer could have testified about Westbo's mental capacity.

Metzger, relying on *Dillard's Department Stores, Inc. v. Strom*, 869 S.W.2d 654 (Tex. App.—El Paso 1994, no writ), asserts that "[a] party's failure to produce important evidence within its control raises a presumption that the evidence, if

produced, would be unfavorable." (Internal quotations omitted.) However, the court in *Strom* further explained that a party's "failure" to produce important evidence within its control constitutes "some probative evidence that will support an adverse jury finding." 869 S.W.2d at 657. Here, unlike in *Strom*, Westbo did not receive an adverse jury finding. Thus, Metzger's reliance on *Strom* is misplaced.

We overrule Metzger's first issue.

## Estoppel

In his second issue, Metzger argues that Tucker, as Westbo's guardian, is estopped from arguing that Westbo lacked the requite mental capacity to execute the release because Tucker herself engaged in real estate transactions with Westbo. Specifically, Metzger asserts that although "Westbo executed a Special Warranty Deed that conveyed her interest in almost 200 acres of land at the same time that she executed the full release," Tucker did not challenge Westbo's mental capacity "to have conveyed away her interest in such valuable real estate." Metzger also asserts that "Westbo deeded to Tucker 124 acres of land in Texas" 54 days prior to Tucker commencing guardianship proceedings on December 22, 2009 against Westbo in the State of Washington. Metzger complains that these real estate transactions are "completely inconsistent and the doctrine of estoppel by conduct should apply to Tucker and through her, to Westbo."

19

Quasi-estoppel is a term applied to certain legal bars, such as ratification, election, acquiescence, or acceptance of benefits. *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ). The long-standing doctrine "precludes a [person] from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *see Schauer v. Von Schauer*, 138 S.W. 145, 149–50 (Tex. Civ. App.—Austin 1911, writ ref'd) ("Where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title, or right, he cannot afterwards assume a position inconsistent with such act, claim or conduct to the prejudice of another." (internal quotations omitted)). And "[t]he doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one [in] which [s]he acquiesced." *Lopez*, 22 S.W.3d at 864; *see also Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765–66 (Tex. App.—Texarkana 1992, writ denied). Unlike equitable estoppel, quasi-estoppel does not require a showing of a false representation or detrimental reliance. *Steubner Realty 19, Ltd.*, 817 S.W.2d at 164.

Here, however, Metzger did not raise his estoppel issue in the probate court, and he did not request a jury question on the issue. Because Metzger did not raise

this issue at trial, he did not preserve it for appellate review. *See* TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 94 ("[A] party shall set forth affirmatively . . . estoppel . . . ."), 278, 279; *see also Ray v. T.D.*, No. 03-06-00242-CV, 2008 WL 341490, at *8 (Tex. App.—Austin Feb. 7, 2008, no pet.) (mem. op.) ("As the party with the burden of proving quasi-estoppel, [appellant's] failure to seek findings and conclusions regarding that theory waives it.").

We overrule Metzger's second issue.

### Jury Charge Error

In his third issue, Metzger argues that the probate court erred in instructing the jury to interpret the language of the release because "[n]either party in this case made any allegation or argument that the Full Release was vague or ambiguous." He also asserts that there is "no evidence as to what Westbo supposedly intended to release when she executed the Full Release, other than the Full Release itself."

To preserve a complaint about a defective jury charge for appellate review, a party must "distinctly" point out to the trial court "the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* And an objection to a jury charge does not satisfy rule 274 "unless the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the

21

conclusion that [the] trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it." *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc*., 134 S.W.3d 385, 404 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd); *see also* TEX. R. CIV. P. 274. If a party fails to lodge an objection to the jury charge that timely and plainly makes the trial court aware of the complaint, error is not preserved and the complaint is waived on appeal. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).

Here, the record reflects that prior to the submission of the case to the jury, both Metzger and Tucker discussed the jury charge with the probate court. After modifying the charge, the probate court gave the parties a revised version and asked whether they had any objections. Each side responded that they had no objection. Because Metzger did not object to the probate court's instruction, he did preserve his complaint for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); TEX. R. CIV. P. 274.

We overrule Metzger's third issue.

**Credit**

In his fourth issue, Metzger argues that if the evidence is legally and factually sufficient to support the jury's finding that Westbo lacked the requisite mental capacity to execute the release, he is entitled to a credit of $46,500 because

Westbo does not "get[] to take all of the money on deposit with the District Clerk without giving credit" for the amount paid to her on May 22, 2006.

The right to an offset is an affirmative defense, and the burden of pleading offset and of proving facts necessary to support it are on the party making the assertion. *Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 704 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc*., 168 S.W.3d 296, 301 (Tex. App.—Dallas 2005, pet. denied); *see also* TEX. R. CIV. P. 94. Here, Metzger has waived the defense because he did not plead for an offset, and he did not make any objection to the jury charge regarding this matter. *See Lone Starr*, 365 S.W.3d at 704; *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 862 (Tex. App.—Fort Worth 2003, pet. denied); *see also* TEX. R. APP. P. 33.1(a).

We overrule Metzger's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Huddle.