In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00089-CV**

_____

**IN THE ESTATE OF RICKY BOYD STACK**

**On Appeal from the County Court at Law**
**Orange County, Texas**
**Trial Cause No. P17250**

**MEMORANDUM OPINION**

Benjamin Stack appeals the trial court's judgment in favor of his siblings, appellees Kristin Prentice and Jacob Boyd Stack, after a jury trial regarding the validity of the will of their father, Ricky Boyd Stack.[1] In six issues, Benjamin (1) challenges the trial court's admission of testimony regarding appellees' discussions with the decedent; (2) asserts that the erroneous admission of appellees' alleged discussions with the decedent probably resulted in an improper verdict; (3) argues

_____

[1]For clarity, we will refer to appellant and appellees by their first names, and we will refer to the decedent as "Stack."

1

that the trial court erred by denying his motion for mistrial; (4) asserts that appellees' attorney offered improper argument during his closing statement; (5) contends that the trial judge erred by denying his motion for judgment notwithstanding the verdict because the evidence was legally insufficient to show that the decedent had testamentary capacity; and (6) argues that the trial court erred by denying his motion for new trial because the evidence was factually insufficient to support the verdict as to undue influence and the decedent's testamentary capacity.

PROCEDURAL BACKGROUND

On June 8, 2015, Jacob filed an application to probate Stack's self-proving written will. According to Jacob's application, the Stack left a written will dated May 8, 2015, and the will named Jacob as independent executor. The will left 47.5% of the decedent's estate to Jacob, 47.5% to Kristin, and 5% to Benjamin. Benjamin filed a contest to the probate of the will and an application for declaratory relief, in which he argued that he did not recognize Stack's signature and the will was witnessed and executed while Stack was "very ill and mentally incapacitated" in the hospital. Benjamin contended that he also did not recognize Stack's signature on a "Transfer on Death Account Application" for Stack's account at Hilliard Lyons, which left 47.5 percent of Stack's non-probate estate to Jacob, 47.5 percent to Kristin, and five percent to Benjamin.

2

According to Benjamin, the changes Stack made to his probate and non-probate estates were ineffective due to Stack's alleged lack of contractual and testamentary capacity and undue influence or coercion allegedly exerted by Jacob and Kristin. Benjamin sought a declaration from the trial court that the will is invalid, and he asserted claims against Jacob and Kristin for tortious interference with inheritance. Benjamin also asserted a claim for exemplary damages. Jacob asserted a general denial and filed a counterclaim, in which he asserted that if the trial court were to uphold the will, Benjamin's interest should be revoked pursuant to the will's *in terrorem* clause.

## THE JURY TRIAL

During his opening statement, counsel for Jacob and Kristin stated as follows:

> Something you'll hear from the notary is she specifically recalls, when Mr. Stack was signing his will, percentages being discussed. She said, "Percentages were discussed. Mr. Stack nodded his head with approval, and he signed." . . . They were there for 15 minutes. You don't need 15 minutes to sign a document. You know why they were in there is because they were reading over the will, making sure Dad understands it, making sure it was consistent with his desires from whenever he told Kristin, "Ben gets 5. You two split the rest." And Kristin says, "Are you sure?" "Yeah, I'm sure. Ben gets 5. You two split the rest." "Why, Dad?" "Because he doesn't deserve it." That's what he said.

Outside the presence of the jury, Benjamin's counsel objected that appellees' counsel had violated the dead man's rule and the trial court's ruling on the parties' motions in limine. Counsel argued that no corroborating evidence had yet been

3

introduced, and moved for a mistrial. The trial judge declined to grant the mistrial, but granted counsel's request for a limiting instruction and indicated that she would allow counsel to re-urge the issue after the proponents closed their evidence.

Attorney Malachi Daws testified that he created the will at Jacob's behest, but Daws believed he was doing so in Stack's interest. Daws testified that he represented Stack, not Jacob, when he drafted the will, but he also explained that he never met Stack, telephoned Stack, or visited Stack in the hospital. Daws explained that he knew Stack was ill, about to die, and needed a will. Daws testified, "I talked with the son [Jacob] who I've known to be a truthful person, and I made the will." Daws explained, "[w]henever someone's in a hospital . . . like is the case here, and I'm being told that they need a will soon, then I will make that happen. Sometimes expediency outweighs being able to go out there and see them." Daws testified that the disposition he was told to make was 47.5% to Kristin, 47.5% to Jacob, and 5% to Benjamin.

Daws testified that he had no reason to doubt that what Jacob told him was what Stack wanted. Daws further explained that he had prepared a power of attorney that authorized Jacob to act on Stack's behalf. According to Daws, it is not a conflict when an agent under a power of attorney is also a beneficiary of the will. Daws testified that he did not contact Benjamin or Kristin before preparing the will. Daws

4

explained that he represents Jacob and Kristin for the probate of Stack's will. Daws testified that after the will contest was filed, he asked the witnesses what their experiences were, and he put what they told him into affidavit form.

Benjamin testified that when he graduated from high school, his relationship with his father "had its ups and downs[]" due to Benjamin's drinking. Benjamin explained that he was an alcoholic when he graduated. Benjamin testified that he did not attend college, and he instead moved to England with Stack when Stack's job transferred him there. According to Benjamin, his drinking escalated at that time. Benjamin testified that after two years in England, he moved back to the United States and continued to drink. When asked how much he drank during his twenties, Benjamin testified "[c]ontinuously, every day."

Benjamin explained that when he first came back to the United States, he still spoke to his parents, "[b]ut then, not so much." According to Benjamin, he was homeless for a period of time before his life stabilized in his late twenties or early thirties. Benjamin testified that in his early thirties, he spoke to his mother once per month, and she was giving him money for epilepsy medication. Benjamin explained that his mother died on January 11, 2011, after being in pain from a long battle with cancer. Benjamin testified that after his mother died, his drinking decreased and he "dried out[.]" According to Benjamin, after his mother died, his father continued to

5

send him money for his medication, and he spoke to his father once or twice per month until his father passed away. Benjamin denied receiving any money from his father with the exception of $150 per month for epilepsy medication. Benjamin testified that after his mother's death, he and his father "were rebuilding and able to redevelop another closeness," and he was devastated when his father died.

According to Benjamin, Stack's drinking escalated after his wife died. Benjamin testified that Stack was more subdued and distant, and he began to notice that his father's speech was slurred, so he knew that Stack was drinking. Benjamin testified that Kristin told him Stack was in the hospital, and he called Stack many times while Stack was hospitalized. Benjamin explained that his father "couldn't speak to me. My sister would hold the phone to his ear, and I would speak. And I'd get maybe a murmur in response, if that." Benjamin testified that he knew his father's condition was bad from speaking with medical personnel, and his father passed away on May 22, 2015.

Benjamin explained that he did not attend his mother's memorial service because he did not want to subject his family to his drinking. In addition, Benjamin testified that he did not attend Stack's memorial service because he "was never told when or where it was to take place." According to Benjamin, his sister informed him about the will that Stack had made and told him that he "could expect to get a little

6

less than she and my brother." Benjamin testified that under the terms of Stack's will, he receives five percent of Stack's estate, which is "immensely less[]" than his siblings. Benjamin explained that he loved his mother and father, and he does not believe that their love for him ever changed. Benjamin testified that he does not believe the will reflects what Stack would have done because Stack would not have wanted to hurt him.

During cross-examination, Benjamin responded that he does not believe his parents' love for him is reflected by the amount of money he receives in a will, and he also testified that his parents paid for him to attend a rehabilitation facility multiple times and provided him with shelter, food, clothing, medicine, and money after he had reached adulthood. In addition, Benjamin agreed that his alcoholism negatively affected his relationship with his parents and created a distance between him and his parents. Benjaming agreed that he did not see his parents during the last twenty years of their lives. When asked why he did not come to see his father, Benjamin testified that he does not have a car, does not drive, and that he had "no way to get there." Benjamin opined that Stack should have left him one-third of his estate. Benjamin explained that he claims that his Stack's will leaving him only five percent of the estate is invalid because his Stack did not know what he was doing when he executed the will. Benjamin agreed that he told his sister he had always

been the black sheep of the family, but he testified, "[t]he last four years[,] I was not a black sheep anymore." Benjamin agreed that the pattern of his life has been to have other people support him.

Benjamin testified that he was denied access "over and over" when he called Stack at the hospital because he did not have the security password, but he admitted that his sister gave him the password when he asked for it. According to Benjamin, when he spoke to Stack, Stack would "mumble a little bit into the phone." During cross-examination, Benjamin testified that his trial testimony regarding not attending his mother's memorial service because of his drinking was different than his deposition testimony, when he testified that he did not attend because he could not afford to come.

According to Benjamin, Stack would not "have made that will on his own." Benjamin opined that Stack's medical condition made Stack unable to have "put that kind of a will together[.]" Benjamin testified that he understood that Stack was falling out of his bed and soiling himself. Benjamin also testified that he did not believe tremors caused Stack's signature on the will to be unrecognizable.

Benjamin explained that he believes his siblings coerced Stack, committed fraud, and exercised undue influence. Benjamin admitted that during his deposition testimony, he testified that his sister is not the kind of person who would commit

fraud, use coercion, or exercise undue influence. Benjamin explained, "I'm saying she's not the type of person that goes around doing this in her day-to-day life and that's just the way she is. This is an isolated . . . situation." Benjamin agreed that if Stack wanted to make a will, he would have called an attorney.

Kristin testified that Stack drank socially when she was growing up, but she never saw him drunk. According to Kristin, Stack's drinking increased after her mother's death. Kristin explained that she usually saw her parents once per year, and she spoke to her mother on the phone two or three times a month. According to Kristin, she called Stack a couple of times per month after her mother's death. Kristin testified that she typically saw Stack once per year after her mother's death.

Kristin explained that in January 2011, Stack seemed tired, grief stricken, and emotional, and over the next few years, Stack gradually got weaker and lost weight. Kristin testified that in January 2011, she "noticed no change cognitively [in her father], other than the grief of losing his spouse." Kristin explained that between 2011until 2015, when Stack became ill, she did not notice any change in his cognitive abilities. Kristin testified that when she visited in December 2012, she noticed that Stack was consistently drinking. According to Kristin, she and Jacob began to suspect that Stack had a drinking problem in 2013 or 2014. Kristin explained that Stack became more reclusive.

Kristin testified that she realized Stack's condition was deteriorating in April 2015, when she was unable to reach him. Kristin contacted Jacob, and Jacob went to Stack's house to check on him. Kristin learned from Jacob that he had found Stack lethargic, extremely weak, sleepy, and "not very communicative." According to Kristin, Stack refused to see a doctor, and Jacob checked on Stack the next day and realized that Stack was "getting progressively worse."

Kristin testified that Stack was admitted to the Medical Center of Southeast Texas by ambulance on April 27, 2015, with yellow skin and eyes, a distended abdomen, and lethargy. According to Kristin, the doctors diagnosed Stack with cirrhosis of the liver and jaundice related to the cirrhosis. Kristin explained that when Stack was admitted to the hospital, he was weak and lethargic, but he recognized Kristin, knew where he was going, and knew that he was ill. Kristin testified that she did not notice a change in her Stack's cognition during the week she spent with him at the hospital. Kristin explained that she flew home on May 2 and returned on May 7. Kristin testified that Stack seemed more alert and awake, had improved physically, and was doing well cognitively when she left on May 2.

According to Kristin, Stack was transferred to Mid-Jefferson Extended Care Hospital on May 7. Kristin testified that when she saw Stack on May 7, he was groggy, sick, and weak. Kristin explained that cognitively, he appeared to be the

10

same, and he knew who Kristin was and was aware of his surroundings. Kristin testified that she stayed approximately one week, so she was present for the signing of the will, but not for the form regarding the Hilliard Lyons account. Kristin explained that she inquired with Hilliard Lyons about the possibility of avoiding probate through the execution of a transfer on death form, which was delivered to Jacob.

According to Kristin, on May 8, the date when Stack executed the will, Stack was weak, tired, and obviously ill, but he "seemed the same[]" cognitively. Kristin explained that between May 8 and May 14, Stack had good and bad days, "days in which he was more lethargic, sleepy[,] and groggy, did not eat well, and then other days in which he was alert and ate better and seemed a little stronger." Kristin testified that on Stack's good days, they would converse or watch television, and on his bad days, "he would sleep a lot. And when he woke up . . . we would talk for a little while. And then he would fall back asleep." Kristin estimated that approximately half of Stack's days were bad days, and that he slept more than he was awake on those days. According to Kristin, between May 7th and May 14th, Stack did not improve, but was "not [in] a downward spiral either, not significantly worse[,]" and she testified that he was "about the same" cognitively.

11

Kristin testified that she mentioned the idea of a will to Stack, and it was her idea for Stack to execute the form regarding the Hilliard Lyons account. According to Kristin, she had spoken with a friend who advised her to avoid probate when possible, and that is the reason she mentioned the Hilliard Lyons account to Stack. Kristin explained that she mentioned a will "because we had received a difficult prognosis that he was in liver failure, and I wasn't sure that my father had his final affairs in order."

Kristin explained that she feels betrayed, hurt, and damaged by Benjamin's allegations against her. Kristin testified, "my heart goes out to him because of his struggle. . . . But the fact that he would accuse me of doing these things to my father, it hurts. I understand that he's hurt. . . . I never thought he would accuse me of such malicious and despicable acts against my own father." According to Kristin, she called Benjamin to let him know that Stack had left him a smaller portion, and she testified that Benjamin said he was not surprised because he had always been the black sheep of the family. Kristin explained that she did not get into specific proportions because Benjamin did not ask, and the conversation was already uncomfortable.

Kristin testified that both of her parents were negatively affected by Benjamin's lifestyle decisions. When asked about Benjamin's testimony that Stack

12

had only been able to murmur when Kristin held the phone to his ear, Kristin testified that Stack was able to speak and carry on a limited conversation with Benjamin that lasted approximately ten to fifteen minutes. Kristin explained that Benjamin's testimony was not consistent with what she observed. Kristin denied that she or Jacob ever instructed the hospital staff not to allow Benjamin to speak to Stack, and Kristin explained that she gave a password to Benjamin when she learned that Benjamin was having trouble reaching Stack by telephone.

With respect to the execution of the will, Kristin explained that she, Jacob, the notary, two witnesses, and Stack were present in the hospital room when the will was executed. Kristin testified that the notary was April Oliver, and the witnesses were Cynthia Johnson and Jonathan East. According to Kristin, Stack's caseworker at the hospital facilitated finding hospital employees to serve as witnesses. Kristin testified that the will was executed after lunch, sometime during the middle of the afternoon, and she explained that during the time she was with Stack in the hospital, he was groggy and non-communicative in the mornings, but during the afternoon hours, "he would become more alert and awake and ready to talk." Kristin explained that when Stack was awake, she was able to carry on intelligible conversations with him. Kristin testified that based upon her observations of Stack, she believed he

13

knew who he was and who was in the room, understood current events, spoke on topic, and knew what assets he owned.

According to Kristin, when Stack signed the will, she was at the foot of Stack's bed, Jacob was at Stack's head, the notary was standing beside Jacob, and the two witnesses were standing on the other side of the bed. Kristin estimated that everyone was in Stack's room for approximately fifteen minutes, and she explained that Jacob read the will to Stack while Stack held a copy in his hands and read along with Jacob. Kristin explained that Stack suffered from tremors, which made it difficult for him to hold objects, so she and Jacob propped a tray up for Stack to rest his arms on while he held the will. Kristin testified that Stack asked questions about the contents of the will, and he never acted in a way that made her think he did not understand what was going on. According to Kristin, the signature on the will is not the way her father normally signed his name, but he suffered from tremors in his hands that made his signature become progressively worse. Kristin testified that she observed Stack initial and sign the will. Kristin testified that she believed, based upon her experience in the room that day, that Stack knew he was signing his will.

Kristin testified that Stack was never diagnosed with Alzheimer's disease or dementia. According to Kristin, she and Jacob never pressured Stack to do anything. Kristin explained, "I would never force my father to do something against his will.

14

I would never do that, especially against my brother. I love my brother. I would never do that." Kristin testified that the will reflects Stack's final wishes, and she is "just trying to do what he wanted[.]" When shown a medical record from May 8, when the will was executed, Kristin read aloud that it stated that Stack was alert and oriented, and his speech and behavior were appropriate. Kristin testified that said description accurately reflected what she witnessed when Stack executed the will. Kristin explained, "I observed him coherent. I observed him aware of his surroundings. I observed him aware of who we were. I observed him aware of the document that he was reading. I observed him aware of what was going on around him."

Benjamin's expert witness, board certified general and forensic psychiatrist Dr. Theresa Vail, testified that she has treated "quite a few[]" patients with cirrhosis of the liver, and she explained that such patients may suffer from psychosis or delirium. Vail explained that with respect to making a will, there are "a couple of things you have to look at[,]" including whether the person knows he is making a will, understands the implications, understands what a will is, knows who his legal heirs are, and knows what property he owns. Vail testified that making a will involves executive functioning.

Vail testified that she reviewed Stack's medical records and concluded that on May 8, 2015, Stack lacked capacity to make a will. According to Vail, her opinion was based on the fact that Stack was extremely ill, and one of his problems was hepatic encephalopathy. Vail explained that hepatic encephalopathy causes delirium because of toxins that have built up in the blood, and those toxins affect attention, concentration, and orientation.

According to Vail, Stack's "cirrhosis was more likely than not what caused his liver failure." Vail testified that a failing liver affects cognition because of the ammonia level in the patient's blood. Vail explained that when Stack arrived at the hospital, he had liver failure, a high ammonia level, and an extremely low sodium level. In addition, Vail testified that some of the medications prescribed to Stack during his hospitalization can cause sedation and confusion. According to Vail, there are four levels of orientation: one is person, the second is place, the third is time, and the fourth is the situation. Vail testified that the medical records do not indicate that Stack did not know who he was, but they do indicate that Stack did not know where he was at times.

Vail explained that if a physician is unable to perform a neurological examination due to the patient's condition, it probably means that the patient is unable to follow directions or to answer questions and has significant neurological

issues. According to Vail, capacity is "very task specific." Vail testified that if a person cannot give information and is hallucinating, the person lacks capacity "to make a will at that point in time because [his] brain is not functioning." Vail explained that on May 8, Stack had low sodium, a urinary tract infection, high ammonia levels, and the nutritionist who evaluated him that day obtained "little response[]" from him. In addition, Vail testified that Stack had cardiomyopathy and pleural effusion on that date.

According to Vail, physicians who saw Stack on the morning of May 15 noted that he was confused, and the nurse's notes said he responded incoherently, and had pulled out his IV PICC line, and his congestive heart failure was noted to be worsening. Vail testified that if Stack were not confused, he would not have pulled the PICC line out. Vail further explained that on May 8, Stack was noted to have fallen out of bed, which indicates that his cognition and reasoning ability were not good. According to Vail, Stack fell again the day before he signed the Hilliard Lyons document. Vail opined that Stack lacked the capacity to enter into a contract, and she explained that her opinion was based upon Stack's inability to maintain his orientation and falling out of bed. Vail testified, "I'm pretty sure that he was confused and had forgotten how ill he was and was climbing out of bed." Vail

17

explained that Stack had pulled on his Foley catheter, which also indicates confusion.

Vail testified that Stack's overall prognosis was extremely poor, and she explained that although he appeared to have been diagnosed with liver cancer, no one had treated him for that issue or performed a biopsy. According to Vail, Stack began a rapid decline on the 17th, and the hospital began giving him morphine on the 18th. Vail explained that she reviewed approximately 2,000 pages of Stack's medical records, and although she used the totality of those records in forming her opinion, she placed greater weight on the dates the will and the Hilliard Lyons document were signed. Vail testified that although Stack's mental status fluctuated somewhat, he was never noted in the records to be awake, alert, and "oriented times four[.]" Vail agreed that nothing in the medical records reflects that Stack was always better in the afternoons. Vail testified that a CAT scan of Stack's head revealed severe cerebral atrophy and a previous small stroke. According to Vail, her opinion that Stack lacked testamentary and contractual capacity on May 8 and May 15 was not a close call.

Vail explained that her opinion had changed since her deposition, when she thought it was "possible but not probable[]" that Stack had capacity because she had reviewed additional records since her deposition. In addition, Vail agreed that based

upon reading records, she cannot say whether Stack knew who his heirs were or the general extent of his property. Vail testified that she had seen the self-proving affidavit on the will and had read the witnesses' affidavits, and Vail agreed that those individuals stated that they believed Stack understood what he was doing, was not confused, and intentionally, voluntarily, and knowingly executed his will.

Vail also testified that Stack was given a medication to help remove ammonia from his system, and she agreed that removing ammonia would clear up the patient's confusion. In addition, Vail testified that nothing in the records indicates that Stack was confused or hallucinating, but the records simply state that Stack fell out of bed. Vail explained that other than a physician's note regarding a hallucination on May 7, no other hallucinations were documented in Stack's records. Vail agreed that with hepatic encephalopathy, the patient's cognitive abilities will go up and down multiple times per day. Vail also agreed that nurses do not always check for four levels of orientation; rather, they more commonly check for three levels of orientation.

Vail testified that when Stack was transferred to Mid Jefferson Extended Care Hospital on May 7, his mental status was checked at 8:00 p.m., and he was noted to be alert, oriented, and cooperative, and he was not noted to be lethargic, confused, obtunded, or comatose. In addition, Vail testified that on May 8, a mental status

cognition assessment was done by a physical therapist, and Stack was marked as being alert and oriented times two and could follow complex commands, and boxes for confused and lethargic were not checked on the records. Vail agreed that on May 8, a nursing flow record noted that between the hours of 7:00 a.m. and 4:00 p.m., Stack was noted to be alert and oriented, and Stack's speech and behavior were appropriate. Vail stated that she saw in the notary's deposition testimony that percentages were discussed with Stack and that Stack nodded his head in agreement. Vail testified that she did not examine Stack.

Jacob testified that he was close to Stack and considered Stack to be his best friend. Jacob also explained that Stack had a good, close relationship with Kristin. Jacob characterized the relationship between Benjamin and his parents as "very stressed[]" and he explained that his parents "wrestled with decisions on how to change [the] track of his behavior. They loved him. They wanted to help him, but they couldn't make his decisions for him." Jacob testified that Stack sometimes became angry because of the effect Benjamin's choices had on his mother. When asked what his personal feelings for Benjamin are, Jacob testified, "I love him very much. He'll always be my brother. No matter what decisions [he makes], misguided as they may be. It doesn't matter. I love him, always will, regardless of what he will continue to put the rest of the family through. He's still my brother."

20

According to Jacob, Stack became severely depressed after his wife died. Jacob explained that after his mother's death, he and his wife lived with Stack for about two years, and he testified that Stack became reclusive and began drinking fairly heavily. According to Jacob, when he was growing up, he did not see Stack drunk, but he did see Stack drunk after 2011. Jacob explained that he had spoken to Stack about Stack's drinking more than once. Jacob testified that Stack remained the same cognitively, but not emotionally.

According to Jacob, on April 27, 2015, Stack did not return Jacob's phone calls, and Jacob became worried. Jacob found Stack in poor condition, and he explained that Stack was very drowsy, had little energy, smelled of urine and body odor, and his skin looked yellow. Jacob explained that he called Kristin and asked Stack to go to the doctor, and although Stack initially did not agree to go to the doctor, Stack ultimately went to the hospital by ambulance.

Jacob testified that he believed he used money from his own account to pay Daws for preparing Stack's will and to pay part of the cost of an expert witness. Jacob explained that he and Kristin were splitting the litigation costs, and they had taken out personal loans to cover the expenses. Jacob explained that he retained Daws on behalf of Stack, pursuant to a power of attorney Stack had executed, to prepare the will. Jacob stated that he read the will to Stack before Stack signed it,

and he testified that based upon Stack's response, the way Jacob read the will to him, the witnesses who were present, and "most importantly . . . the interaction and the question and answer, the give-and-take, back-and-forth about the will," Jacob believed Stack understood that he was executing a will, generally knew what property he owned, and knew who his next of kin were. According to Jacob, Stack signed the Hilliard Lyons document. Jacob testified that he believed Stack had contractual capacity when he signed the Hilliard Lyons document. Jacob explained, "I'm saying that at the time he executed these contracts, he had capacity. But I'm not saying he had it for a hundred percent of every second of his life from that time frame." Jacob opined that Stack had better capacity on May 15 than April 27. According to Jacob, Stack was drowsier and more lethargic in the mornings and the evenings. Jacob explained that around the middle of the day, when the documents were executed, Stack was generally better.

Jacob and Kristin presented the video deposition testimony of board certified general and geriatric psychiatrist Dr. Martha Leatherman. Leatherman explained that she had been asked to review medical records from the acute care hospital and the extended care hospital, affidavits, depositions, and some of the legal documents, such as the will, to evaluate Stack's cognitive, mental capacity on the dates the will and the Hilliard Lyons document were executed. Leatherman stated that her daily

22

practice involves examining cognition in geriatric patients, and she has testified as an expert on that issue approximately six to seven hundred times in the context of guardianship. Leatherman testified that with respect to estates, she has dealt with issues of testamentary capacity and undue influence about fifteen times. Leatherman explained that she has testified on behalf of will contestants more frequently than for will proponents.

Leatherman testified that Stack had been diagnosed with hepatic encephalopathy, and she explained that encephalopathy is a neurological term for delirium. According to Leatherman, hepatic encephalopathy is delirium that is primarily due to liver failure. Leatherman explained that the term "delirium" means a disorder of consciousness in which the brain is not able to maintain its level of arousal normally. Leatherman testified that patients with hepatic encephalopathy can be hyper-aroused and agitated, difficult to awaken, drowsy, or "have periods of complete lucidity[.]" Leatherman explained that features of delirium include hallucinations and disorientation, but the primary issue is one of level of consciousness. According to Leatherman, unlike dementia, delirium is typically reversible.

Leatherman testified that waxing and waning levels of alertness are typical of hepatic encephalopathy. Leatherman explained that the records do not indicate that

23

anyone ever diagnosed Stack with dementia, and she testified that a patient with hepatic encephalopathy can return to his normal cognitive baseline as part of the waxing and waning levels of alertness. Leatherman testified that she saw evidence in the records of waxing and waning of Stack's mental abilities. According to Leatherman, "delirium tends to become symptomatically more pronounced [during] early morning, late evening, and through the night."

Leatherman testified that she reviewed Stack's will and the documents pertaining to Stack's investment account with Hilliard Lyons. Leatherman explained that percentages are "very simple stuff" for someone with Stack's engineering background, intelligence, and level of mathematical knowledge. Leatherman testified that because she was unable to question and observe Stack, she relied upon medical records, as well as the observations of laypeople and medical professionals who were around Stack, in forming her evaluation. When asked how much weight she gives to other people's observations of the person's behavior, Leatherman responded, "a lot."

Leatherman testified that daily assessments of Stack were performed when he was transferred to the extended care hospital on May 7. According to Leatherman, the records indicate that Stack's level of wakefulness changed multiple times within a day. Leatherman cited as an example, medical observations of Stack from May 7,

which state that Stack was drowsy at 4:00 a.m., lethargic at 11:00 a.m., and alert at 11:20 a.m., and the physical therapist "noted a fluctuating cognitive status." With respect to the records for May 8, Leatherman explained that Stack was alert and oriented times two, and the check-off box for "confused" was not checked. Leatherman explained that assessing whether someone is alert and oriented "times" a specific number means the level of arousal, and she testified that in Stack's records, he was sometimes noted to be alert and lethargic at the same time, and she testified that she therefore was not sure what the medical personnel were assessing. Leatherman testified that medical personnel were sometimes inconsistent in what they were assessing, and she explained that someone could be lethargic, yet understand and follow commands.

According to Leatherman, the records indicate that on May 7, Stack was able to be reoriented, meaning that he could learn information as he could at his normal baseline level of functioning. In addition, Leatherman testified that medical records from May 8 indicated that Stack's neurological abilities were normal when assessed at 7:00 a.m., noon, and 4:00 p.m. Leatherman explained that, based upon the items available for her review and the fact that Stack's cognitive status fluctuated over the course of each day, it is not possible for her to say whether Stack had testamentary capacity. Leatherman testified, "the medical record leaves me saying 'I don't know'"

and "maybe only the people who were in the room really knew." According to Leatherman, she cannot definitively say whether Stack did or did not have capacity on May 8 and May 15. Leatherman testified that Stack was "fairly alert all day[]" on May 15, but was incoherent or confused in the morning and in the evening. Leatherman explained that no confusion was noted in the records during the middle of that date.

Leatherman agreed that during the periods when his status was improved, Stack had the ability to understand what he was doing and to make certain decisions for himself. Leatherman explained that deciding to distribute his assets by making a will would have been "a simple decision[]" for Stack. According to Leatherman, when Stack was not obtunded or confused, he knew he had three children. Leatherman also testified that during the parts of the day that were better for him, Stack had the ability to recognize people and would have generally understood what property he owned. Leatherman testified that "cognitive capacity doesn't live in the liver. It lives in the brain, and his cognition fluctuated, although the underlying disease was always there."

Cynthia Johnson, a nurse's aide at Mid-Jefferson Extended Care Hospital, testified that she witnessed the execution of Stack's will. Johnson stated that other than being a witness to Stack's will, she has no other relationship with the Stack

family and had never met them before. Johnson testified that she has no claim regarding the handling of the estate. Johnson explained that Stack was her patient on May 8, and she recalled that he had jaundice and appeared to be weak, but he did not act like a dementia patient and never appeared confused in her presence. Johnson testified, "I didn't notice him being confused. I just noticed him being weak." In addition, Johnson testified that she never noticed Stack hallucinating.

Johnson testified that as she was coming down the hallway, a nurse asked her to be a witness to Stack's will. Johnson estimated that she was in Stack's room for about fifteen minutes. According to Johnson, the will was being read to Stack, and "if he didn't understand the question, his son would read it and try to help him understand the question." Johnson explained that she executed an affidavit about what she observed in Stack's room during the execution of the will, and her affidavit was published to the jury. Johnson testified that the affidavit accurately reflects her recollection of the execution of Stack's will. Johnson testified that she stated in the affidavit that she saw Stack coherently answering and asking questions, and that she believed Stack had the mental capacity to understand that he was signing his will.

According to Johnson, Stack knew who was in the room, and he appeared to agree with the contents of the will because he asked questions before signing it. Johnson testified that Stack's hands were shaky when he signed the will, but Stack

"did the best he could[,]" and he initialed and signed the will in her presence. Johnson explained that she was present when the other witness and the notary signed the will.

Johnson testified that she believed Stack knew what was going on in the room and was aware that he was signing his will. Johnson explained, "I don't think anybody was trying to make him sign." Johnson testified that she did not know why the self-proving affidavit was dated May 5 rather than May 8 because she signed all of the documents on the same date. Johnson explained that the other witness, Jonathan East, is her coworker from another department.

During cross-examination, Johnson testified that she was not sworn in prior to signing the affidavit, and Stack never declared to her that the document was his last will and testament. Johnson explained that she did not know the details of Stack's medical condition and did not perform any mental assessment on him because those things are not within the purview of her job.

The affidavit of the other witness to the will, Jonathan East, was introduced into evidence. In his affidavit, East averred that the charge nurse asked him to go to Stack's hospital room to witness his will, and he explained that when he arrived, Stack, Jacob, Johnson, and a notary were present. East averred as follows:

> I personally witnessed Mr. Stack sign his will. He signed on his own with no one else assisting him. Looking back, . . . it did appear to me

that Mr. Stack knew who was in the room and that he was signing his will. I had no reservations about this. I also did not detect that anyone . . . was exercising undue influence or coercion over Mr. Stack. His signing of the will appeared to be intentional and voluntary.

April Oliver, the notary who notarized the power of attorney, Stack's will, and the Hilliard Lyons document, testified that she can refuse to notarize a document if she believes the person executing it is not of sound mind. Oliver testified that if the person appeared not to be of sound mind, she would not serve as a notary for that person. Oliver explained that she never saw evidence of undue influence, coercion, or coaching by Jacob or Kristin. Oliver testified that she notarized the will on May 8 after seeing Stack sign it, and she explained that she made an error when she wrote the date the document was notarized. According to Oliver, Stack was "a lot more alert" and "a lot more talkative" on that day, and she believed he would recover.

Oliver explained that when Stack was signing and initialing the will, he expressed concern about the legibility of his handwriting. Oliver testified that a person's signature need not be legible for it to be legal if the person has provided proper identification to the notary. According to Oliver, Stack physically touched the will and looked through it. Oliver testified that Kristin and Jacob were "very attentive to their father[]" and answered the questions he asked, and Oliver stated that Stack "was very much coherent on the 8th." When Jacob's counsel asked whether percentages were discussed, Benjamin's counsel objected on the grounds of

29

hearsay and Rule 601, and the trial court overruled the objection. Oliver testified, "there were times whe[n] I would hear numerical things, like percentages and things like that[,]" and these discussions took place while Stack had the will and was looking at it. Oliver explained that she did not remember the specific percentages. Oliver testified that she is certain she heard the word "percentages."

According to Oliver, Stack agreed with everything that was in the will, and if he had a question, "he would ask, and it would be addressed." Oliver testified, "he agreed because he signed it[,]" and Oliver explained that she "made it real clear that Mr. Stack didn't have to sign anything that he didn't want to." According to Oliver, Stack "would nod his head in agreement." Oliver testified, "I believe that Mr. Stack knew that he was signing his last will and testament and . . . that he was of sound mind when he signed that document." Oliver explained that she believed Stack was aware that he was leaving percentage distributions to his children, and he never did or said anything that made her believe he did not know what was happening. Oliver stated that she believed Stack signed the will voluntarily, and "there was nobody bullying him or telling him or coaching him as to what he needed to say or do." According to Oliver, Stack signed the will in the witnesses' presence, and they signed in Stack's presence.

Oliver testified that she also saw Stack sign the Hilliard Lyons transfer on death document on May 15. Oliver testified that Stack was not as upbeat on May 15 as he had been on May 8, and his color was not as good, but no one had to help him sign the document. According to Oliver, the document was executed "around lunchtime." Oliver testified that she believed Stack "was aware of what he was signing." Oliver described Stack as "very much alert[,]" and did not do or say anything that made her think otherwise. Oliver explained that Stack was not falling asleep or drifting in or out of consciousness. Oliver denied seeing Jacob exercise undue influence or coercion over Stack. Oliver testified that she "[m]ost definitely[]" believes that Stack knew what he was doing when he executed the documents. According to Oliver, she was present with Stack for thirty-five to forty minutes each time he executed documents. During cross-examination, Oliver testified that Stack did not declare to her that the will was his last will and testament, and he did not tell the witnesses so.

At the conclusion of Oliver's testimony, Jacob's counsel argued that, based upon *Quitta v. Fossati*, statements made by Stack were admissible because the testimony of Oliver, as well as the transfer on death form, corroborated the percentage distributions set forth in Stack's will. The trial judge ruled that "the

31

testimony that's come in is corroborative of the decedent's prior discussions with the proponents as I understand it, based on what y'all've indicated it will be."

Teresa Hanks, Stack's neighbor and a close friend of Stack's wife, Sandy, testified that Sandy was usually upset when speaking on the phone with Benjamin. According to Hanks, Sandy's relationship with Benjamin "was very stressful for her[]" and "[s]he cried a lot." Hanks explained that after Sandy died, Stack gradually became like a hermit and shut everyone out. Hanks explained that Stack's drinking also increased. Hanks testified that she visited Stack when he was hospitalized at the Medical Center of Southeast Texas, and although Stack was very weak, he knew Hanks, and they carried on conversations. Hanks testified that she also visited Stack when he was at the extended care hospital, and although Stack was weaker and more medicated, he still recognized Hanks and talked to her. Hanks testified that Stack still possessed his mental capabilities, and she explained, "I have no doubt that he knew exactly who I was and what I was saying." Hanks testified that she executed an affidavit regarding her interactions with Stack. In the affidavit, Hanks stated that it made sense that Stack thought Ben did not deserve an equal portion because of the stress he had caused for the family and because he had already received support.

Jacob and Kristin's counsel called Kristin to the stand, and Kristin testified that the percentages outlined in the will and the transfer on death document reflect

Stack's wishes "[b]ecause that is what he told me he wanted." According to Kristin, she asked Stack if he had a will, and he told her that he did not have one but would like to have a will prepared. Kristin explained that Stack told her he wanted Benjamin to get five percent, and he wanted Kristin and Jacob to split the rest. Kristin testified that Stack later reiterated those wishes to both her and Jacob. Kristin testified that she is "just trying to do what [Stack] wanted. Kristin testified that she "had no reason to believe that he was mentally incapable."

Jacob's counsel also called Jacob to testify. Jacob explained that he believes the distributions in the will and the transfer on death documents are consistent with Stack's desires because Stack told Jacob that is what he wanted to do. According to Jacob, after Kristin told him what Stack had said to her regarding percentages, Stack told Jacob several times that he wanted Benjamin to receive five percent and for Jacob and Kristin to split the remainder. Jacob testified that he read every word of the will to Stack, and that Stack specifically asked, "Ben gets 5, right?" when Jacob read the percentages. Jacob explained that he read the will aloud for his Stack's benefit as well as for the witnesses. Jacob expressed confidence that the documents reflect Stack's wishes.

The jury found that Stack had capacity to sign the will and the Hilliard Lyons transfer on death document; the will was not the product of undue influence; the

Hilliard Lyons document was not signed as a result of undue influence; and Jacob and Kristin did not tortiously interfere with Benjamin's inheritance. Benjamin filed a motion for new trial and a motion for judgment notwithstanding the verdict, both of which were overruled by operation of law, and Benjamin appealed.

## ISSUES FIVE AND SIX

In issue five, Benjamin argues that the evidence was legally insufficient to support the jury's findings as to capacity. Specifically, Benjamin asserts that the trial court erred by denying his motion for judgment notwithstanding the verdict. In issue six, Benjamin asserts that the evidence was factually insufficient to support the jury's findings as to capacity and undue influence. Specifically, Benjamin maintains that the trial court erred by denying his motion for new trial. Benjamin contends that Jacob and Kristin presented no more than a scintilla of evidence that Stack had testamentary capacity, and he also asserts that the evidence conclusively established Stack's lack of testamentary and contractual capacity. We address issues five and six first because, if sustained, they would result in rendition of judgment or a new trial, respectively, and they are interrelated.

Evidence is legally sufficient to support a factfinder's verdict if the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing

34

evidence to determine whether it was sufficient to support the trial court's verdict, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *see Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied). "[I]n every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review." *City of Keller*, 168 S.W.3d at 821. We will sustain a legal sufficiency challenge "when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Suberu*, 216 S.W.3d at 793. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

With respect to a factual sufficiency challenge, we examine the entire record and consider all of the evidence the trial court admitted to determine whether the challenged finding is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819.

> [T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

"A JNOV is proper only if a directed verdict would have been proper." *In re Estate of Longron*, 211 S.W.3d 434, 438 (Tex. App.—Beaumont 2006, pet. denied). "[A] directed verdict is proper only if the evidence conclusively establishes the movant's right to judgment, negates the opponent's right to judgment, or is insufficient to raise a fact issue on a vital fact." *Id.*

A person of sound mind has the right and power to make a will if, when the will is made, the person is eighteen years of age or older. Tex. Estates Code Ann. § 251.001(1) (West Supp. 2017).[2] Before a will is admitted to probate, the proponent of the will must establish that (1) the will was properly executed and (2) the testator had testamentary capacity when the will was executed. *Estate of Danford*, ___ S.W.3d ___ , 2018 WL 2012401, at *3 (Tex. App.—Houston [14th Dist.] May 1, 2018, no pet. for review filed). The proponent may make a *prima facie* case that the will was properly executed and the testator had capacity by introducing a self-

---

[2]Because the amendment to section 251.001 does not materially affect the outcome of this appeal, we cite to the current version of the statute.

proving will into evidence. *Id*. "The burden of producing evidence negating testamentary capacity then shifts to the will's opponent, although the burden of persuasion always remains with the proponent." *Id*. A testator has testamentary capacity when he possesses sufficient mental ability when the will is executed to (1) understand the effect of making the will and the general nature and extent of his property, (2) know his next of kin and the natural objects of his bounty, and (3) "have sufficient memory to assimilate the elements of executing a will, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them." *Id*. "The key inquiry is whether the testator had testamentary capacity on the day the will was executed, which 'may be inferred from lay and expert witnesses' observation of the testator's conduct prior to or subsequent to the will's execution.'" *Id*. (quoting *In re Estate of O'Neil*, No. 04-11-00586-CV, 2012 WL 3776490, at *6 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.)).

Undue influence implies that the existence of testamentary capacity has been subject to and controlled by a dominant influence or power. *Estate of Danford*, 2018 WL 2012401, at *3. Generally, the party contesting a will's execution bears the burden of proving undue influence. *Id*. "The contestant must prove the existence and exertion of an influence that subverted or overpowered the testator's mind at the time

37

[he] executed the testament such that the testator executed a will that [he] otherwise would not have executed but for such influence." *Id.*

To establish mental capacity to contract, the evidence must show that, when the contract was signed, the person appreciated the effect of what he was doing and understood the nature and consequences of his acts and the business he was transacting. *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi 2004, pet. denied).

> Circumstantial evidence may be relevant to proving capacity or lack thereof, such as the conduct of the party in question, circumstances tending to produce a particular mental condition, and prior or subsequent existence of a mental condition from which a party's capacity or incapacity at the time in question may be inferred.

*Estate of Reifler*, 540 S.W.3d 626, 636 (Tex. App.—Amarillo 2017, no pet.). The issue of whether a person knew and understood the nature and consequences of his actions at the time of contracting is generally a question for the jury. *In re Estate of Robinson*, 140 S.W.3d at 793-94.

In this case, the jury heard conflicting evidence from experts regarding whether Stack had capacity, with Vail opining that Stack definitely did not have capacity when the will and the Hilliard Lyons document were executed, and Leatherman explaining that, although Stack could return to his normal cognitive baseline during times when he was waxing, due to his fluctuating cognitive status,

38

she did not know whether Stack had capacity at the relevant times. Leatherman explained that she gave significant weight to other people's observations of Stack's behavior and noted that perhaps the only people who really knew about Stack's cognitive status were those who were in the room with him, and she testified that matters such as percentages are "very simple stuff" for someone with Stack's background. The jury also heard testimony from Kristin, Jacob, Johnson, and Oliver, each of whom testified or averred that, based upon their personal observations of Stack, they believe Stack was of sound mind. With respect to Stack's cognitive status when the will was executed, the jury also had before it the affidavit of East, who averred that he believed Stack was of sound mind.

The jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819. Crediting evidence that reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we conclude that the evidence was legally sufficient to support the jury's verdict that Stack had testamentary and contractual capacity when he executed the will and the Hilliard Lyons document. *See Suberu*, 216 S.W.3d at 793; *City of Keller*, 168 S.W.3d at 821; *In Re Estate of Danford*, 2018 WL 2012401, at *3; *In re Estate of Longron*, 211 S.W.3d at 438. The evidence that Stack possessed testamentary and contractual capacity rose beyond a mere scintilla. *See Suberu*, 216

S.W.3d at 793. Therefore, the trial court did not err by denying Benjamin's motion for JNOV. *See In re Estate of Longron*, 211 S.W.3d at 438. Accordingly, we overrule issue five.

With respect to issue six, the jury heard Kristin testify that she did not exercise undue influence over Stack, and she sought simply to carry out his wishes. Benjamin offered no testimony other than his opinion regarding undue influence by Jacob and Kristin, and although he testified that his Stack would not have given him such a small inheritance because Stack would not have wanted to hurt him, he also testified that his alcoholism had negatively affected his relationship with his parents and his parents, who had provided him with some financial support during his adulthood. The jury also had before it evidence from Johnson, Oliver, and East that they did not observe anyone exercising undue influence over Stack. With respect to the issue of capacity, the jury heard conflicting evidence regarding whether Stack had capacity when he signed the will and the Hilliard Lyons document on death contract. The jury was the exclusive judge of the credibility of witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819. Examining the entire record and considering all of the admitted evidence, the jury's findings regarding the existence of capacity and the lack of undue influence are not so contrary to the overwhelming weight of the evidence that they are clearly wrong and unjust. *See*

40

*Pool*, 715 S.W.2d at 635. Therefore, the trial court did not err by denying Benjamin's motion for new trial. *See id.*; *see generally* Tex. R. Civ. P. 320, 326. We overrule issue six.

## ISSUES ONE AND TWO

In issue one, Benjamin argues that the trial court abused its discretion by admitting testimony from Jacob and Kristin regarding their alleged discussions with Stack about percentages over Benjamin's hearsay and Dead Man's Rule objections. In issue two, Benjamin contends the trial court's admission of evidence regarding these alleged discussions probably resulted in an improper verdict. We address issues one and two together.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules and principles. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will reverse a judgment if an error by the trial court probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). In assessing harm, we review the entire record, and the complaining party must demonstrate that the judgment turns on the

41

particular evidence admitted. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Rule 601 of the Texas Rules of Evidence provides that in cases by or against a party in the party's capacity as an executor or as a legal heir of the testator, a party may not testify about an oral statement by the testator unless the party's testimony about the statement is corroborated. Tex. R. Evid. 601. Texas courts construe the Dead Man's Rule narrowly. *Quitta v. Fossati*, 808 S.W.2d 636, 641 (Tex. App.—Corpus Christi 1991, writ denied). Properly corroborated statements are admissible regardless of the Dead Man's Rule. *Id.*; *In the Estate of Curtis*, No. 09-14-00242-CV, 2015 WL 5604772, at *7 (Tex. App.—Beaumont Sept. 24, 2015, no pet.) (mem. op.) (citing *Quitta*, 808 S.W.2d at 641); *see also* Tex. R. Evid. 601(3)(A). "Corroborating evidence must tend to support some of the material allegations or issues which are raised by the pleadings and testified to by the witness whose evidence is sought to be corroborated." *Quitta*, 808 S.W.2d at 641. "Corroborating evidence may come from other competent witnesses or another source, including documentary evidence." *In the Estate of Curtis*, 2015 WL 5604772, at *8. "Corroborating evidence . . . need not be sufficient standing alone to support the verdict, but must tend to confirm and strengthen the testimony of the witness and show the probability of its truth." *Quitta*, 808 S.W.2d at 641.

42

The record reflects that Benjamin's counsel obtained a running objection as to testimony regarding discussions with Stack regarding percentages, both on the basis of Rule 601 and hearsay. As discussed above, Johnson testified that she observed Stack coherently asking and answering questions before signing his will. Oliver testified that Stack physically touched the will, looked through it, and Kristin and Jacob answered any questions he asked. Oliver testified that she heard percentages being discussed while Stack was looking at the will. In addition, Oliver explained that Stack nodded his head in agreement. The jury had before it evidence that the Hilliard Lyons document, which Stack executed one week after he executed his will, contained the same percentage distributions as the will. We conclude that the trial court did not abuse its discretion by admitting evidence regarding Kristin and Jacob's discussion with Stack about percentage distributions because other evidence strengthened their testimony and tended to show the probability of its truth. *See Quitta*, 808 S.W.2d at 641. In addition, given the other evidence regarding Stack's mental status at the time the documents were executed, as well as the nature and quality of Stack's relationships with Benjamin, Kristin, and Jacob, even if the admission of the percentage evidence had been erroneous, we cannot conclude that the judgment turned on that particular evidence. *See Nissan Motor Co. Ltd.*, 145 S.W.3d at 144; *see also* Tex. R. App. P. 44.1(a)(1).

The same harm analysis applies to Benjamin's hearsay argument regarding the admission of the evidence regarding percentages. Assuming without deciding that the trial court erred by overruling Benjamin's hearsay objections to the complained-of testimony regarding percentages, viewing the record as a whole, we cannot conclude that the judgment turned on that particular evidence. *See Nissan Motor Co. Ltd.*, 145 S.W.3d at 144; *see also* Tex. R. App. P. 44.1(a)(1). For all of these reasons, we overrule issues one and two.

## ISSUE THREE

In issue three, Benjamin argues that the trial court abused its discretion by denying his motion for mistrial after appellees' counsel violated the trial court's limine order and the Dead Man's rule during his opening statement. A trial court's ruling on a motion for mistrial is also reviewed for abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006). To obtain reversal of a judgment based upon improper jury argument, a party must prove an uninvited or unprovoked error that was (1) preserved by proper objection or motion and (2) was not curable by an instruction. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *see also Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). An instruction from the trial court generally cures any probable harm. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). A party who contends he suffered incurable harm

44

must demonstrate that, based on the record as a whole, the offensive argument was so extreme that a "'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883 (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (1954)). "[I]ncurable argument is that which strikes at the very core of the judicial process." *Id*. Cases in which courts find incurable harm typically involve "unsubstantiated attacks on the integrity or veracity of a party or counsel, appeals to racial prejudice, or the like." *Id*.

As discussed in detail above, when trial counsel referred to percentages and other alleged statements by Stack during opening statement, Benjamin's counsel objected and moved for a mistrial. The trial judge denied the motion for mistrial, but granted counsel's request for a limiting instruction and instructed the jury "to disregard the statements that have been made by Mr. Daws, at this point, as to what the decedent told anybody as to how anything was split. So I'm instructing you to disregard those statements." On this record, we conclude that the trial court's instruction to the jury to disregard the complained-of portion of counsel's opening statement was sufficient to cure any harm. *See Penalver*, 256 S.W.3d at 680; *Phillips*, 288 S.W.3d at 883. Therefore, the trial court did not abuse its discretion by denying Benjamin's motion for mistrial. We overrule issue three.

45

## ISSUE FOUR

In issue four, Benjamin complains of alleged improper jury argument during opposing counsel's closing. Specifically, Benjamin argues that opposing counsel provided his personal impressions as to the credibility of witnesses, provided legal instructions to the jury that conflicted with those provided by the trial judge, stated that Benjamin's expert testified differently at trial from her deposition testimony, testified regarding the enforceability of *in terrorem* clauses when no evidence had been adduced regarding that issue, and improperly summarized testimony about Stack's statements regarding the will.

The record reflects that Benjamin's counsel did not object to any of the complained-of portions of opposing counsel's closing argument. As explained in our analysis of issue three, to obtain reversal of a judgment based upon improper jury argument, a party must show that he preserved error by making a proper objection or motion. *See Phillips*, 288 S.W.3d at 883; *see also* Tex. R. App. P. 33.1(a). Because counsel did not object or make a motion in which he pointed out to the trial judge the allegedly improper portions of the closing argument, nothing has been preserved for our review. *See Phillips*, 288 S.W.3d at 883; *see also* Tex. R. App. P. 33.1(a). Accordingly, we overrule issue four. Having overruled each of Benjamin's appellate issues, we affirm the trial court's judgment.

AFFIRMED.

$$\text{_____}$$
STEVE McKEITHEN
Chief Justice

Submitted on March 29, 2018
Opinion Delivered August 30, 2018

Before McKeithen, C.J., Kreger and Horton, JJ.